LISA ROBBINS, ADMINISTRATRIX (ESTATE OF ELIJAH JAMAL HEZEKIA ROBBINS MARTIN), ET AL. *v.* PHYSICIANS FOR WOMEN'S HEALTH, LLC, ET AL.
(AC 31816)

Gruendel, Bear and Schaller, Js.

---

578

Argued May 24, 2011—officially released February 21, 2012

*Steven D. Ecker*, with whom were *Joel T. Faxon* and, on the brief, *M. Caitlin S. Anderson*, for the appellants (plaintiffs).

*Frank H. Santoro*, with whom, on the brief, was *R. Cornelius Danaher, Jr.*, for the appellees (named defendant et al.).

*Opinion*

SCHALLER, J. The principal issue in this case is whether the trial court incorrectly concluded that a covenant not to sue, executed by the plaintiff in favor of a corporate tortfeasor, forecloses the imposition of successor liability, as a matter of law, on a subsequent purchaser of that company's assets. For the reasons listed below, we answer this question in the affirmative and, accordingly, reverse the judgment of the trial court.

The record contains the following undisputed facts and procedural history that are relevant to our resolution of the present case. The plaintiff, Lisa Robbins, individually and as administratrix of the estate of her son, Elijah Jamal Hezekia Robbins Martin, appeals from the summary judgment rendered by the trial court in favor of the defendants Physicians for Women's Health,

LLC, and Women's Health USA, Inc.[1] On appeal, the plaintiff claims that the court incorrectly concluded that her settlement with Shoreline Obstetrics and Gynecology, P.C. (Shoreline), necessarily terminated her suit for successor liability against the defendants.

On October 10, 2005, the plaintiff gave birth to a son at Lawrence and Memorial Hospital (Lawrence and Memorial) in New London. Shortly after his birth, the child died. Jonathan Levine, an obstetrician, and Donna Burke-Howes, a certified nurse midwife, were present at the time and were responsible for rendering medical care to the plaintiff and her son. Levine and Burke-Howes were employees of Shoreline. In July, 2006, Shoreline was sold to the defendants. Shortly thereafter, the plaintiff filed suit against Levine, Burke-Howes, Shoreline, Lawrence and Memorial and the defendants, alleging medical malpractice.

On July 3, 2008, the defendants filed a motion for summary judgment, arguing, inter alia, that they "had no connection to the care and treatment rendered to the plaintiff['s] [son] nor were they in a business or contractual relationship with . . . Shoreline [at the time of his death]," such that they could be liable for the plaintiff's malpractice claim. In response, the plaintiff filed an amended complaint alleging that the defendants were liable under a theory of successor liability and then an objection to the defendants' motion for summary judgment on that ground. Specifically, the plaintiff argued that the continuity of enterprise exception applied because "Shoreline still called itself Shoreline, the same people were employed, the same

---

[1] The plaintiff named the following as defendants in this action: Physicians for Women's Health, LLC, Women's Health USA, Inc., Shoreline Obstetrics and Gynecology, P.C., Lawrence and Memorial Hospital, Jonathan Levine and Donna Burke-Howes. Because certain of those parties are not involved in this appeal, we refer in this opinion to Physicians for Women's Health, LLC, and Women's Health USA, Inc., as the defendants.

management existed and the same location and equipment were utilized." The trial court agreed with the plaintiff and denied the motion for summary judgment, stating that "the defendants ha[d] failed to meet their burden of establishing the absence of a genuine issue of material fact as to successor liability . . . ."

On November 14, 2008, after reaching a settlement and executing two separate covenants not to sue, the plaintiff withdrew her claims against Levine, Burke-Howes and Shoreline.[2] The record demonstrates that this settlement was reached by providing the plaintiff with monetary compensation through a medical malpractice insurance policy that covered both Levine and Burke-Howes. Insurance documents and interrogatory responses indicate that Levine and Burke-Howes were each insured for up to $1 million.[3] An affidavit submitted

---

[2] The covenant executed between the plaintiff, Levine and Shoreline provides in relevant part: "[The parties] understand and affirm that by executing this covenant not to sue forever discharge[s] [Levine and Shoreline] from all claims . . . including . . . [t]hose arising from . . . any care and treatment rendered by [Levine and Shoreline] to [the plaintiff or her son]." This document also states: "This covenant not to sue does not [a]ffect claims against the Physicians for Women's Health, LLC, entities, which remain defendants in the pending action." The covenant between the plaintiff and Burke-Howes contains substantially similar language.

[3] The dissent argues that Shoreline "continued to exist and to have assets, including but not limited to its insurance coverage after its sale of assets to the defendants." This statement is not supported by the facts contained within the record. Although the excerpted portion of the asset sale agreement contained within the record references an "excluded assets list," this list was never provided to the trial court. It is axiomatic that "[i]n seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence [proffered by the movant] must be viewed in the light most favorable to the opponent." (Internal quotation marks omitted.) *Witt* v. *St. Vin-*

by the plaintiff's attorney, dated July 6, 2009, states that Levine, Burke-Howes and Shoreline "tender[ed the] policy limits" in this settlement.[4]

On July 1, 2009, the defendants filed a second motion for summary judgment. In this motion, the defendants argued that "successor liability . . . derives exclusively from and is coterminous with the liability of [Shoreline]." From this premise, the defendants argued that the plaintiff could not proceed because the covenant not to sue "completely discharged" Shoreline from liability. On December 7, 2009, the court issued a memorandum of decision granting the defendants' motion for summary judgment on these grounds. This appeal followed.

On appeal, the plaintiff claims that her execution of a covenant not to sue in favor of Shoreline does not prevent her from seeking recovery from the defendants under a theory of successor liability. In doing so, the plaintiff argues that a covenant not to sue is an agreement not to proceed against a particular defendant that, unlike a release, does not discharge liability for the underlying cause of action. In response, the defendants argue that successor liability may afford no greater recovery against a successor than is available against the predecessor and, therefore, the covenant not to sue executed in favor of Shoreline also inures to their benefit.

cent's Medical Center, 252 Conn. 363, 373 n.7, 746 A.2d 753 (2000). Because it is undisputed that the defendants did not furnish the "excluded assets list" to the trial court and viewed in the light most favorable to the nonmoving party as our standard of review requires, we must presume that the list does not enumerate additional assets that could have been obtained by the plaintiff in her settlement with Shoreline.

[4] On August 9, 2007, the plaintiff also withdrew her action against Lawrence and Memorial after a settlement was reached with that party through alternative dispute resolution.

On September 21, 2011, this court ordered the parties to file supplemental briefs addressing whether the plaintiff's recovery from Shoreline foreclosed the possibility of successor liability as a matter of law.[5] The defendants filed a supplemental brief on October 5, 2011, in which they argue that successor liability may be imposed only when the predecessor corporation is no longer able to afford the plaintiff relief. The defendants also assert that the plaintiff's settlement with Shoreline demonstrates that she cannot meet this threshold requirement as a matter of law. The plaintiff filed a supplemental brief on October 6, 2011, arguing that a case premised on a theory of successor liability may be pursued when recovery has been obtained from the predecessor corporation and that, in such a case, "the successor entity is liable for the difference between [the] plaintiff's damages . . . and the amount . . . that the plaintiff was able to recover from the predecessor."

"We review the [plaintiff's] claims under the well established standard of review regarding the rendering of summary judgment. . . . An appellate court must decide whether the trial court erred in determining that

---

[5] The plaintiff argues that this question is not properly before the court. We disagree. The trial court's conclusion that the execution of a covenant not to sue in favor of the predecessor corporation entitled the defendants to judgment as a matter of law requires, a fortiori, a factual conclusion that the predecessor continued to exist and remained capable of affording the plaintiff with some measure of relief. Thus, even if the court's legal analysis was incorrect, its disposition of the case nonetheless may be affirmed if the continued availability of the predecessor entitles the defendants to judgment as a matter of law. See *Connell* v. *Colwell*, 214 Conn. 242, 245, 571 A.2d 116 (1990) ("[w]e conclude that the defendant's motion for summary judgment was properly granted, albeit for reasons partially divergent from the conclusions reached by the trial court"); *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 420, 538 A.2d 219 (1988) ("we conclude that the trial court was correct in granting summary judgment, although not for the reason upon which it relied"); *Favorite* v. *Miller*, 176 Conn. 310, 317, 407 A.2d 974 (1978) ("[w]here the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it").

there was no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Citation omitted; internal quotation marks omitted.) *Coss* v. *Steward*, 126 Conn. App. 30, 40, 10 A.3d 539 (2011). "Where the trial court is presented with undisputed facts . . . our review of its conclusions is plenary, as we must determine whether the court's conclusions are legally and logically correct . . . ." (Internal quotation marks omitted.) Id., 41.

I

We first address whether the imposition of successor liability is foreclosed by the plaintiff's settlement with Shoreline.[6] Although we agree with the defendants' assertion that a case premised on the mere continuation or continuity of enterprise theories of successor liability may not be maintained when the predecessor corporation constitutes a viable source of recovery, we conclude that the undisputed evidence contained within the record does not establish that the plaintiff has failed to meet this requirement as a matter of law.

The legal principles governing a claim for successor liability in Connecticut were first set forth by this court in *Chamlink Corp.* v. *Merritt Extruder Corp.*, 96 Conn. App. 183, 899 A.2d 90 (2006). In that case we explained that "[t]he mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for the debts or liabilities of the first corporation except where the purchaser expressly or impliedly agrees to assume the obligations, the purchaser is merely a continuation of the selling corporation, [the companies merged] or the transaction is entered into fraudulently to escape liability." (Internal

---

[6] Because the establishment of successor liability represents a threshold question that must be resolved before the import of the covenant not to sue may be determined, we address the impact of the plaintiff's recovery from Shoreline first.

quotation marks omitted.) Id., 187. We continued by noting that "[t]here are two theories used to determine whether the purchaser is merely a continuation of the selling corporation." Id., 187–88. "Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." (Internal quotation marks omitted.) Id., 188. "Under the continuity of enterprise theory, a mere continuation exists if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers."[7] (Internal quotation marks omitted.) Id.

The imposition of successor liability is generally intended to prevent corporations from externalizing the costs of contract or tort liability by transferring assets into the name of a second corporation. See *United States* v. *General Battery Corp., Inc.*, 423 F.3d 294, 306 (3d Cir. 2005) ("[t]he overriding goal of successor liability . . . is to balance the interest in preventing tortfeasors from externalizing the costs of their misconduct with the interest in a fluid market in corporate

[7] We note that the plaintiff is not required to prove, as the dissent implies, that the consideration paid for the predecessor's assets was "materially less than their fair value" or that some "other wrongful acts" occurred "in connection with the asset transaction." While such facts would undoubtedly be relevant if the plaintiff sought the imposition of successor liability under the fraudulent transaction exception to the general rule of nonliability; see G. Kuney, "A Taxonomy and Evaluation of Successor Liability," 6 Fla. St. U. Bus. L. Rev. 9, 25–26 (2007); the absence of good faith is not among the elements of either the mere continuation or continuity of enterprise theories established in *Chamlink Corp.* See M. Reilly, "Making Sense of Successor Liability," 31 Hofstra L. Rev. 745, 785–87 (2003) (noting that courts employ "fraud-free successor liability" doctrines, including continuity of enterprise, "ostensibly to provide a source of compensation for claimants who cannot establish fraud").

assets" [internal quotation marks omitted]), cert. denied sub nom. *Exide Technologies* v. *United States*, 549 U.S. 941, 127 S. Ct. 41, 166 L. Ed. 2d 250 (2006); *United States* v. *Mexico Feed & Seed Co.*, 980 F.2d 478, 487 (8th Cir. 1992) ("[t]he purpose of corporate successor liability . . . is to prevent corporations from evading their liabilities through changes in ownership"); G. Kuney, "A Taxonomy and Evaluation of Successor Liability," 6 Fla. St. U. Bus. L. Rev. 9, 60 (2007) ("the purpose of [successor liability is] to provide contract and tort creditors with an avenue for recovery in appropriate cases against successor entities, when the predecessor that contracted with them or committed the tort, or the action that later gave rise to the tort, had sold substantially all of its assets and [is] no longer a viable source of recovery"). Thus, there is no need for successor liability "if the predecessor corporation remains a viable source for recourse." 19 C.J.S., Corporations § 747 (2007).

In *Foster* v. *Cone-Blanchard Machine Co.*, 460 Mich. 696, 706, 597 N.W.2d 506 (1999), the Michigan Supreme Court concluded that a settlement with a predecessor corporation that yielded $500,000 precluded imposition of successor liability under continuity of enterprise theory. In that case, the court stated: "While failure of the predecessor to dissolve may not be fatal in every action for successor liability, especially, for example, where the predecessor continues as a shell or is otherwise underfunded, the fact that a predecessor remains a viable source for recourse is." Id. The continued availability of the predecessor corporation also proved fatal to the plaintiff's claims of successor liability in *Craig* v. *Oakwood Hospital*, 471 Mich. 67, 98–99, 684 N.W.2d 296 (2004). In that case, the Michigan Supreme Court stated that "the policies that justify the imposition of successor liability [were] noticeably inapplicable" because the plaintiff had "sought and obtained a judgment" from

the predecessor corporation and its employees. Id., 99. We find the reasoning of these cases to be persuasive. We therefore conclude that the imposition of successor liability under the mere continuation and continuity of enterprise theories requires a threshold determination that the predecessor no longer represents a viable source of relief.[8]

Although the record in the present case indicates that both Levine and Burke-Howes were insured against medical malpractice for up to $1 million and that these limits were tendered in the plaintiff's settlement with Shoreline, our review of the record does not reveal undisputed evidence demonstrating the amount of damages suffered by the plaintiff.[9] Absent such evidence,

---

[8] Although not expressed in *Chamlink Corp.*, this conclusion is consistent with the underlying purpose of successor liability discussed in the sources cited previously. When the predecessor continues to represent a viable source of recovery, no negative externality has been created by the transfer of assets and deviation from the general rule of nonliability would only serve to discourage the free alienability of assets. See *United States* v. *General Battery Corp., Inc.*, supra, 423 F.3d 306. Conversely, when the predecessor remains in existence, but has divested itself of assets to such an extent that it can no longer afford meaningful relief to a plaintiff, departure from the general rule of nonliability may be required in order to obtain an equitable result. See *Brandon* v. *Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 598–99 (7th Cir. 2005) (imposition of successor liability proper although predecessor continued to remain in existence and possessed limited assets).

[9] Although the dissent agrees that imposition of successor liability on a subsequent purchaser of assets can be prevented by the continued existence of the predecessor, it appears to adopt a bright line rule that any recovery against the predecessor, regardless of the amount or the manner in which it is obtained, entitles a defendant to judgment as a matter of law. This position not only conflates the distinctions between a covenant not to sue and a release, it also ossifies an otherwise flexible and fact specific approach to successor liability. The establishment of such bright line rules in this context is undesirable. See G. Kuney, supra, 6 Fla. St. U. Bus. L. Rev. 13 ("[T]here appears to be a long term trend to limit the applicability of the successor liability doctrines by stating the applicable standard in the form of a bright line rule or set of rules. This trend toward bright line rules threatens the original purpose of successor liability, which was born to serve as a counterbalance to corporate law's limitation-of-liability protections afforded asset purchasers. [Successor liability] was originally a set of

we are unable to conclude that Shoreline represented a viable source of recovery to the plaintiff as a matter of law.[10] We therefore decline to affirm the trial court's award of summary judgment on this ground.[11]

## II

The plaintiff argues that the court incorrectly concluded that the covenant not to sue executed in favor of Shoreline prevents the imposition of successor liability as a matter of law. Specifically, the plaintiff argues that, unlike a release, the covenant does not discharge the underlying cause of action against Shoreline and, therefore, does not prevent her from seeking recovery against the defendants. We agree.

extremely fact-specific and context-sensitive standards based upon an examination of non-exclusive lists of flexible factors rather than rigid bright line rules. . . . To serve its original purpose as a safety valve ensuring just results in the face of corporate law's limitations on liability, successor liability should remain more flexible and fluid so that its applications can be adjusted as new forms of transactions are developed and pursued.").

[10] Although the dissent states that the extent of damages "does not have any relevance" to the imposition of successor liability, it characterizes the settlements in the present case as "substantial." The facts contained in the record do not support such a finding. The word "substantial," an inherently qualitative term, suggests that the plaintiff has been adequately compensated for her claims. In order to reach such a conclusion, the amount recovered by the plaintiff would have to be compared with the damages sustained. Such an inquiry would require additional factual findings that this court is not entitled to make.

[11] For two reasons, we are not persuaded by the dissent's speculation that the imposition of this requirement "may result in an increase in insurance premiums for many businesses and professional entities to protect against . . . unjustified, unforeseeable, random and fortuitous claims . . . ." First, our adoption of a threshold requirement related to the availability of a predecessor corporation has no impact on the elements of the continuity of enterprise or mere continuation theories of successor liability set forth in *Chamlink Corp.* Consequently, the number of cases in which this form of liability is imposed will not, as a matter of logic, increase as a result of our decision. Second, the dissent makes this assertion without analysis or citation to any authority. Absent such support, the assertion is no more than speculation and conjecture. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009).

"A covenant not to sue is a covenant by one who had a right of action at the time of making it against another person, by which he or she agrees not to sue to enforce such right of action." 76 C.J.S., Release § 3 (2007). "A covenant not to sue is distinguishable from a release in that it is not a present abandonment or relinquishment of a right or claim but is merely an agreement not to sue on an existing claim or it is an election not to proceed against a particular party. In other words, a covenant not to sue is an agreement not to enforce an existing cause of action against another party to the agreement." 66 Am. Jur. 2d, Release § 4 (2011). "The touchstone of a covenant not to sue is its reservation of rights for the benefit of one party." Id.

The distinction between a release and a covenant is, perhaps, most clear in the context of joint tortfeasors. "[A]t common law a release of one joint tortfeasor released the other tortfeasors, [while] a covenant not to sue did not." *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 725 n.10, 735 A.2d 306 (1999). Indeed, this statement of the common law appears to be well established in this state. See *Viera* v. *Cohen*, 283 Conn. 412, 433–34, 927 A.2d 843 (2007); *Dwy* v. *Connecticut Co.*, 89 Conn. 74, 83–84, 92 A. 883 (1915), superseded in part by statute as stated in *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 406–407, 623 A.2d 995 (1993); see also 66 Am. Jur. 2d, supra, § 4 ("[a] covenant not to sue differs from a release in that a release extinguishes a cause of action as to all joint tortfeasors whereas a covenant not to sue does not extinguish the cause of action and does not release other joint tortfeasors even if it does not specifically reserve rights against them" [internal quotation marks omitted]); 4 Restatement (Second), Torts § 885 (2) (1979) ("[a] covenant not to sue one tortfeasor or not to proceed further against him does not discharge any other tortfeasor liable for

the same harm"); Restatement (Third), Torts, Apportionment of Liability § 24 (b) (2000) ("[p]ersons released from liability by the terms of a settlement are relieved of further liability to the claimant for the injuries or claims covered by the agreement, but the agreement does not discharge any other person from liability"); 76 C.J.S., supra, § 47 ("[G]enerally, a covenant . . . not to sue the person or all the persons liable to the covenantor, at least where it is unlimited in time and scope, operates as, or has a legal effect identical to a release . . . . *The rule is otherwise in respect of an agreement not to sue which is made to apply to fewer than all the persons liable, particularly where the agreement specifically states an intention not to affect any claim against such other persons.*" [Emphasis added.]); id., § 68 ("[a] covenant . . . not to sue one or less than all of joint tortfeasors . . . will not bar an action against the others . . . particularly where [the covenant not to sue] specifically [provides] that the covenant shall not affect the covenantor's rights as against the other joint tortfeasors"); Restatement (Third), supra, § 16, comment (d), illustration 2 ("[t]he voluntary dismissal, without prejudice, of one of several parties treated as a single entity . . . does not extinguish the liability of all other parties").[12]

The defendants in the present case, however, are not joint tortfeasors as that term generally is understood under Connecticut law. See *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 716 ("[j]oint liability is

---

[12] Although our legislature has abrogated the common-law result when releases are used in the joint tortfeasor context; see General Statutes § 52-572e (b) ("[a] release by the injured person . . . of one joint tortfeasor does not discharge the other tortfeasors unless, and only to the extent, the release so provides"); our Supreme Court has explicitly excluded application of the statute in cases premised on vicarious liability. See *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 722. Because we conclude that successor liability, like the doctrine of respondeat superior, is a derivative form of liability; see footnote 13 of this opinion; § 52-572e (b) is inapposite to our analysis.

based upon the concept that all tortfeasors are independently at fault for their own wrongful acts"). Rather, the plaintiff seeks to hold the defendants vicariously liable for the medical malpractice of Shoreline and its employees.[13] The impact of a covenant not to sue in this context represents an issue of first impression to the appellate courts of this state. See id., 725 n.10. "In the absence of state decisional guidance, we look to the reasoning of other jurisdictions that have confronted analogous circumstances." *Connecticut Carpenters Benefit Funds* v. *Burkhard Hotel Partners II, LLC*, 83 Conn. App. 352, 357, 849 A.2d 922 (2004).

In *Hovatter* v. *Shell Oil Co.*, 111 Ariz. 325, 326, 529 P.2d 224 (1974), the Arizona Supreme Court addressed a case in which the plaintiffs sought recovery for an explosion allegedly caused by the negligent filling of a butane tank. Id. Specifically, the plaintiffs sought to hold Shell Oil Company vicariously liable under the doctrine of respondeat superior for the negligent actions of a gasoline station and its employees. Id. In that case, the plaintiffs had executed a covenant not to sue in favor of the gasoline station that explicitly reserved the plaintiffs' right to maintain an action

---

[13] Although undoubtedly different from the doctrine of respondeat superior, the concept of successor liability also falls within the definition of vicarious liability established by our Supreme Court. Compare *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 692 n.16, 849 A.2d 813 (2004) ("[V]icarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of public policy that one person should be liable for the act of [another]. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." [Internal quotation marks omitted.]) with 63 Am. Jur. 2d, Products Liability § 134 (2010) ("[t]he basis for the continuity of enterprise exception is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another"); see also *R.C.M. Executive Gallery Corp.* v. *Rols Capital Co.*, 901 F. Sup. 630, 636 (S.D.N.Y. 1995) (characterizing successor liability as "fundamentally a form of secondary, vicarious liability").

against Shell Oil Company. Id. The court reasoned "that a covenant not to sue is not a legal release of liability for the tort" and that "[c]ovenants not to sue should be construed in harmony with the intent of the parties." Id., 326–27. Accordingly, the court concluded that the covenant did not prevent the imposition of vicarious liability. Id.

Arizona case law appears to have extended the holding of *Hovatter* to other forms of vicarious liability as well. In *Blocher* v. *Thompson*, 169 Ariz. 182, 183, 818 P.2d 167 (App. 1991), the Arizona Court of Appeals addressed a case in which the plaintiff, Mark Blocher, was injured in an automobile accident allegedly occasioned by the negligence of Susan Thompson, a seventeen year old girl. In exchange for a settlement of $15,000, Blocher executed a covenant not to sue in favor of Thompson that explicitly reserved his right to pursue a cause of action against Thompson's parents under a theory of vicarious liability.[14] Id., 184–85. The proceeds of the settlement represented a sum equal to the policy limits of the automobile insurance policy maintained by Thompson. Id., 184. Citing *Hovatter*, the court held that "[c]ovenants not to sue should be construed in harmony with the intent of the parties" and concluded that the execution of the covenant did not prevent the imposition of vicarious liability upon Thompson's parents. (Internal quotation marks omitted.) Id., 185.

The result reached under Arizona law is consistent with other jurisdictions. See *Harris* v. *Aluminum Co. of America*, 550 F. Sup. 1024, 1030 (W.D. Va. 1982) ("a covenant not to sue given to an alleged agent . . . does not automatically release the alleged principal from

---

[14] Arizona law permits, under certain circumstances, a plaintiff to hold a parent vicariously liable for injuries caused by their child in a motor vehicle accident pursuant to the "family purpose doctrine." See *Pesqueira* v. *Talbot*, 7 Ariz. App. 476, 480, 441 P.2d 73 (1968).

vicarious liability"); *Alaska Airlines, Inc.* v. *Sweat*, 568 P.2d 916, 930 (Alaska 1977) ("covenant not to sue" containing express reservation of rights did not prevent the imposition of secondary liability); *JFK Medical Center* v. *Price*, 647 So. 2d 833, 834 (Fla. 1994) ("voluntary dismissal of the active tortfeasor, with prejudice, [when the plaintiff entered into settlement agreement with the active tortfeasor while explicitly reserving the right to sue vicariously liable employer] is not the equivalent of an adjudication on the merits, and such a dismissal will not bar continued litigation against the passive tortfeasor"); *Boucher* v. *Thomsen*, 328 Mich. 312, 321–22, 43 N.W.2d 866 (1950) (imposition of liability on vicariously liable party permissible when covenant contained explicit reservation of rights); *Larkin* v. *Otsego Memorial Hospital Assn.*, 207 Mich. App. 391, 393–94, 525 N.W.2d 475 (1994) (covenant not to sue physician does not prevent hospital from being held vicariously liable for medical malpractice under doctrine of respondeat superior), leave to appeal denied, 450 Mich. 867, 539 N.W.2d 380 (1995).[15] Consequently, we conclude

---

[15] Although other jurisdictions have reached the opposite conclusion; see generally 24 A.L.R.4th 547 (1983) (analyzing and synthesizing jurisdictional divisions as to effect of covenant not to sue and release in context of secondary liability); we find the reasoning of these cases generally unpersuasive. Some cases, addressing the issue in the context of respondeat superior, conclude that allowing the imposition of liability on an employer would contravene the intent of the parties to the covenant by creating a right of indemnification against the settled employee. E.g., *Holmstead* v. *Abbott G. M. Diesel, Inc.*, 27 Utah 2d 109, 114, 493 P.2d 625 (1972) ("[it] would be wholly abortive of [the covenant's] intended object and purpose if it went no further than to protect the employee against a direct action by the injured party but afforded no protection against an [indemnity action] by his employer"). However, this reasoning is undercut where, as here, the covenant itself contains an express reservation of rights against the vicariously liable party. Still other cases prevent the imposition of liability without attempting to intone the distinctions between releases and covenants not to sue. See, e.g., *Bacon* v. *United States*, 321 F.2d 880, 884 (8th Cir. 1963) (stating that "the mere fact that the instrument is called a covenant not to sue does not prevent the parties from entering into an agreement which releases a tort-feasor" and that "[i]t matters little how the servant was

that executing a covenant not to sue a predecessor corporation does not prevent the imposition of liability upon a successor corporation as a matter of law.[16]

Returning our attention to the present case, we begin by noting that the agreement executed between the plaintiff and Shoreline is construed properly as a covenant not to sue rather than a release. While the language of the agreement purports to discharge Shoreline of all liability, it also contains an explicit reservation of the plaintiff's right to continue pursuing a cause of action against the defendants. Although such an agreement may be novel in the context of successor liability, principles of contract interpretation require that we construe the agreement as a covenant not to sue. See *Dwy* v. *Connecticut Co.*, supra, 89 Conn. 83–84 (citing favorably cases from other jurisdictions holding that "where the

released from liability" [internal quotation marks omitted]). Absent such analysis, we do not find this latter category of cases enlightening.

[16] The defendants cite *Syenergy Methods, Inc.* v. *Kelly Energy Systems, Inc.*, 695 F. Sup. 1362 (D.R.I. 1988), in support of the proposition that a covenant not to sue a predecessor corporation prevents the imposition of liability on a successor. In *Syenergy Methods, Inc.*, the plaintiff entered into a covenant not to sue the predecessor corporation of the named defendants. Id., 1363. Thereafter, the plaintiff commenced suit for patent infringement, and the defendants moved for an order to show cause as to why the plaintiff should not be held in contempt of the covenant not to sue, which had become a court order. Id., 1363–64. The court concluded that the defendants were successor entities under two theories of successor liability, the "de facto merger" and "mere continuation" doctrines. Id., 1365. As such, the court reasoned that "if . . . the debts and liabilities of the selling corporation . . . pass to the purchasing corporation, then the symmetries of justice require that the rights and other contractual entitlements of the selling corporation, *unless expressly reserved*, must pass as well." (Emphasis added.) Id., 1365–66. Thus, the court granted the defendants' motion for an order to show cause as to why the plaintiff should not be held in contempt of the covenant not to sue. Id., 1366. *Syenergy Methods, Inc.*, however, fails to adequately address the distinctions between releases and covenants not to sue. Moreover, the facts of the present case may be readily distinguished from *Syenergy Methods, Inc.*, because the covenant not to sue executed by the plaintiff in the present case contains an explicit reservation of her right to seek recovery against the defendants. Accordingly, the defendants' reliance on *Syenergy Methods, Inc.*, is misplaced.

instrument used words of release but accompanied them with an express reservation of the right to pursue others than the releasee . . . the intent not to cut off the right of action against others was apparent, and that a reasonable construction of the instrument required that it be regarded as one whose purpose was to render the releasee immune from further claim, and that, therefore it be treated as a covenant not to sue, or as having the legal effect of such covenant"); see also 76 C.J.S., supra, § 3 ("[t]he difference [between a release and a covenant not to sue] is one of intent and grows out of the construction placed on the terms of the instrument"); 2 Restatement (Second), Contracts § 295 (2) (1981) ("[w]ords which purport to release or discharge a promisor and also to reserve rights against other promisors of the same performance have the effect of a contract not to sue rather than a release or discharge").[17]

The covenant not to sue at issue constitutes a bilateral contract in which the plaintiff agreed not to pursue her claims against Shoreline. This covenant prevents the plaintiff from seeking further recovery from Shoreline in a direct action. In contrast to a release, however, the covenant does not discharge Shoreline's liability for underlying causes of action. In light of this retention of rights, we conclude that the covenant does not foreclose the imposition of successor liability against the defendants as a matter of law. Accordingly, the court's conclusion to the contrary, granting the motion for summary judgment in favor of the defendants, was improper.[18]

---

[17] Although we agree with the dissent that "it is the substance of a document that governs its interpretation and application," the dissent's conclusion that the parties to this covenant intended to prohibit the plaintiff from pursuing a cause of action against the defendants is belied by the explicit retention of that precise right on the face of the document itself.

[18] We are not persuaded by the dissent's assertion that allowing the plaintiff to proceed "open[s] the door" to a "windfall recovery . . . ." Use of the term "windfall" implies that the plaintiff will obtain a recovery beyond what

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion GRUENDEL, J., concurred.

BEAR, J., dissenting. Because I agree with the trial court's well reasoned decision, and would affirm its judgment, I respectfully dissent from the majority opinion. The issue in this case is whether an agreement by the plaintiff with a corporate predecessor and two of its employees (alleged tortfeasors) (1) to settle the plaintiff's claims against the alleged tortfeasors, (2) to covenant not to sue the alleged tortfeasors in the future and (3) to discharge the alleged tortfeasors' liability bars recovery by the plaintiff against the alleged successors to the alleged corporate tortfeasor. Like the trial court, I conclude that on the material undisputed facts of this case, recovery by the plaintiff from the alleged successors is barred. Additionally, I conclude that the result of the majority's ruling in this case is to allow the plaintiff the opportunity for an unjustified windfall recovery from the defendants, i.e., recovery in excess

is necessary to compensate her for the damages sustained. There is no risk of this occurring in the present case because any judgment obtained by the plaintiff must account for the amount received previously by the plaintiff in her settlements with Shoreline and its employees. See *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 111–12, 952 A.2d 1 (2008) ("The rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint [or successive] tortfeasors. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once." [Internal quotation marks omitted.]); *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 333–34, 593 A.2d 478 (1991) ("[a] payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment" [internal quotation marks omitted]).

of what she could have recovered from the corporate predecessor on the date of the alleged negligence. Accordingly, I would affirm the judgment of the trial court.

The plaintiff, Lisa Robbins, individually and as administratrix of the estate of her deceased son, Elijah Jamal Hezekia Robbins Martin (Elijah), appeals from the summary judgment rendered by the trial court in favor of the defendants Physicians for Women's Health, LLC (Physicians), and Women's Health USA, Inc. (Women's Health).[1] On appeal, the plaintiff claims that the court erroneously concluded that the settlement agreement, entered into by the plaintiff and the corporate predecessor alleged tortfeasor, Shoreline Obstetrics and Gynecology, P.C. (Shoreline), a former defendant in this case; see footnote 1 of this opinion; and the plaintiff's covenant not to sue and discharge from liability, necessarily barred her suit for medical malpractice against the defendants on "mere continuation" or "continuity of enterprise" theories of successor liability.

The material undisputed facts of this case support my analysis of the issues presented on appeal. Accordingly, I set them forth here. Elijah was born in October, 2005, at Lawrence and Memorial Hospital. The plaintiff's obstetrician was Jonathan Levine, and her certified nurse midwife was Donna Burke-Howes, both of whom were employed by Shoreline. The plaintiff had a high-risk pregnancy, and when Elijah was born, he was transferred to Yale-New Haven Hospital, where he later died, allegedly due to negligence at or near the time of his birth. In October, 2005, neither Physicians nor Women's Health had any ownership interest in the shares or

[1] Lawrence and Memorial Hospital, Jonathan Levine, Donna Burke-Howes and Shoreline Obstetrics and Gynecology, P.C., also were named defendants in this case. The plaintiff settled her claims with those defendants before summary judgment was rendered in this case. Accordingly, I refer to Physicians and Women's Health as the defendants on appeal.

assets of Shoreline, and thus on the date of the alleged negligence they had no direct or vicarious duty to the plaintiff or to Elijah. In July, 2006, approximately nine months after Elijah's death, Shoreline entered into a purchase of assets and sale agreement with Physicians.[2] On October 16, 2006, the plaintiff commenced suit against Levine for medical malpractice and against Physicians, Women's Health, and Lawrence and Memorial Hospital on a claim of vicarious liability for the alleged malpractice of Levine. On December 14, 2006, the plaintiff amended her complaint and added Shoreline as a defendant, also on a claim of vicarious liability. On March 7, 2007, she then added Burke-Howes as a defendant, alleging medical malpractice against her.

On July 3, 2008, Physicians and Women's Health filed their first motion for summary judgment, asserting that they could not be held liable for Elijah's death because they had no relationship with Shoreline at the time Elijah died. In opposition, the plaintiff maintained that the "mere continuation" and the "continuity of enterprise" exceptions to the general rule of successor nonliability applied to this case.[3] After consideration of the

---

[2] The exact relationship between Physicians and Women's Health cannot be ascertained from the record. The plaintiff, however, treats them as interrelated, and the defendants have not raised an issue related to this treatment. The asset transaction between Shoreline and the defendants is the sole basis alleged by the plaintiff for her claims against the defendants.

[3] In her brief to the trial court, the plaintiff argued that "[a]ll of the factors relevant to the mere continuation exception apply here" and that the "continuing enterprise doctrine" also applies, seemingly using these terms interchangeably. I note that in *Medina* v. *Unlimited Systems, LLC*, United States District Court, Docket No. 3:09cv1430 (MRK) (D. Conn. December 15, 2010), Judge Kravitz, in interpreting *Kendall* v. *Amster*, 108 Conn. App. 319, 948 A.2d 1041 (2008), and *Chamlink Corp.* v. *Merritt Extruder Corp.*, 96 Conn. App. 183, 187, 899 A.2d 90 (2006), was persuaded that Connecticut "treat[s] continuity of enterprise as [its] preferred version of the mere continuation exception, essentially defining mere continuation as continuity of enterprise." (Internal quotation marks omitted.) *Medina* v. *Unlimited Systems, LLC*, supra, Docket No. 3:09cv1430 (MRK). Although I note Judge Kravitz' interpretation of our case law, I am not persuaded that we do not recognize both the mere continuation theory and the continuity of

parties' arguments, the court rendered its decision denying the defendants' motion for summary judgment and concluding that there existed disputed material facts about whether the defendants were successor entities. On October 8, 2008, the plaintiff filed her third amended complaint, alleging specifically that Physicians and Women's Health, as successor entities, were liable for the medical malpractice of Levine and Burke-Howes.[4]

On December 30, 2008, in connection with a substantial monetary settlement between the plaintiff and Shoreline and Levine, the plaintiff executed a document, entitled "[c]ovenant [n]ot [t]o [s]ue."[5] In the document, the plaintiff covenanted not to sue Levine, Shoreline and, inter alia, the past, present and future agents, officers, employees, assigns, etc., of Shoreline, and she additionally agreed to discharge[6] them from liability "forever . . . ."[7] The document specifically

enterprise theory as separate exceptions to the general rule of successor nonliability.

[4] The plaintiff did not specify under which exception to the general rule of successor nonliability she was pursuing her claim.

[5] The plaintiff executed a separate document, entitled "Settlement Agreement and Covenant not to sue," related to Burke-Howes and Burke-Howes' insurer, Promutual Insurance Group, also on December 30, 2008. The plaintiff and her counsel were the only signatories on that document.

[6] "'Discharge' is defined by the Merriam-Webster Dictionary as 'to relieve of a charge, load, or burden,' 'to release from an obligation' and 'to set aside.'" *Detels* v. *Detels*, 79 Conn. App. 467, 473 n.6, 830 A.2d 381 (2003).

[7] The document provides in relevant part: "In full and complete consideration of the payment by Medical Professional Mutual Insurance Company . . . and ProSelect Insurance Company of the sum of          ; [the plaintiff] . . . hereby covenant[s] not to sue Jonathan Levine, M.D., Shoreline . . . Medical Professional Mutual Insurance Company . . . ProSelect Insurance Company, and their past, present, and future officers, directors, partners, stockholders, attorneys, agents, servants, employers, employees, professional corporations, medical staff, representatives, affiliates, subsidiaries, insurers, reinsurers, heirs, predecessors in interest, and assigns and all other persons, firms, or corporations with whom any of the former have been affiliated (the 'Covenantees') regarding all claims, demands, actions, suits, debts, causes of action and liabilities . . . . This covenant not to sue does not [affect] claims against the Physicians for Women's Health LLC entities, which remain defendants in the pending action.

provided, however, that it did not affect the plaintiff's claims against the defendants. The defendants, however, were not parties to the document, nor was the document signed by Levine or a representative of Shoreline; the only signatory on the document was the plaintiff.

On July 1, 2009, the defendants filed their second motion for summary judgment, asserting, inter alia, that the plaintiff's covenant not to sue Shoreline specifically discharged Shoreline from liability, and, therefore, because the defendants' alleged liability was based on a claim of successor liability, if Shoreline, their predecessor, was relieved of liability, the defendants, necessarily, also were relieved of liability. They further argued that any liability they were alleged to have to the plaintiff exclusively derived from Shoreline's liability, and, therefore, if Shoreline was relieved of liability,

---

"[The plaintiff] understand[s] and affirm[s] that by executing this covenant not to sue forever discharging the Covenantees from all claims, demands, actions, suits, debts, causes of action and liabilities of every name and nature, whether known or unknown, including, but in no way limited to [those] arising from or in any way related to or growing out of, any care and treatment rendered by any or all of the Covenantees to [the plaintiff or Elijah] . . . . It is [the plaintiff's] intent to discharge any and all such claims, demands, actions, suits, debts, causes of action and liabilities against all Covenantees, and [I] hereby acknowledge that [I] have received consideration for the discharge of all such claims, demands, actions, suits, debts, causes of action and liabilities. . . .

"[I] also understand and affirm that by executing this covenant not to sue, [I am] setting up a complete bar to any recovery at law or in equity for any and all of the claims, demands, actions, suits, debts, causes of action and liabilities against the Covenantees, and [I am] satisfied with the consideration that [I] have received in exchange for this covenant not to sue that [I] have given to all of the Covenantees. . . .

"[I] understand and acknowledge that this covenant not to sue is for the compromise of a disputed claim and that the payment referred to herein is not to be construed as an admission of liability on the part of any Covenantee. [I] agree that [I] will not disclose and our attorneys have agreed that they will not disclose to any third party the terms of this covenant not to sue or the settlement to which it relates, unless such a disclosure is required by law or is agreed to by the Covenantees."

its successors, including the defendants, also were relieved of liability. The trial court agreed and granted the defendants' motion for summary judgment. This appeal followed.

The plaintiff claims that the court improperly granted the defendants' motion for summary judgment. She argues that the covenant not to sue was not a release from liability, despite the discharge language contained in it, and that the parties specifically stated in the document that the plaintiff's claims against the defendants were preserved.[8] As previously set forth, however, the defendants were not parties to the document that purported to preserve the plaintiff's claims against the defendants while settling her claim with Shoreline and releasing Shoreline from all liability.

The settlement between the plaintiff and Shoreline and its employees did not occur until after the asset transaction. Thus, after the defendants purchased the assets of Shoreline, the plaintiff continued to have available to her substantial monetary remedies against Shoreline and against its employees, and the plaintiff eventually took advantage of those remedies, settled her claims against them and executed covenants not to sue them, which covenants specifically stated that Shoreline and its employees were released from all liability "forever . . . ." Because the plaintiff had substantial monetary remedies available from Shoreline and its employees, which continued to exist after the asset transaction, and because her theories of successor liability are either or both the "mere continuation" or "continuity of enterprise" of Shoreline and the defendants, e.g., variations on a one continuous enterprise

---

[8] The plaintiff, however, was the sole signatory to the covenant not to sue. Neither Shoreline nor Levine executed the covenant containing the plaintiff's unilateral statement of her "right" to sue the defendants.

theme, I conclude that she is barred from seeking damages from the defendants under either theory of successor liability. Thus, I disagree with the majority's assertion "that the undisputed evidence contained within the record does not establish that the plaintiff has failed to meet this requirement [that a case premised on the mere continuation or continuity of enterprise theories of successor liability may not be maintained when the predecessor corporation constitutes a viable source of recovery] as a matter of law." As the plaintiff, with the participation of her counsel, affirmatively acknowledged and demonstrated by her own actions when she voluntarily settled her claims against Shoreline and its employees, the amount received by the plaintiff as a result of that settlement must be, as the majority states, a "viable source of recovery to the plaintiff as a matter of law." Especially in light of the undisputed evidence that Shoreline and its employees paid the plaintiff at least $2 million in that settlement, inter alia, there was sufficient evidence before the trial court for it to conclude that there were no material issues of disputed fact and that the defendants were entitled to summary judgment as a matter of law on the issue of whether the defendants were liable to the plaintiff under either of her theories of successor liability.[9]

The long-standing rule is that a successor is not liable for the debts and obligations of its predecessor. See annot., "Liability of Successor Corporation for Injury or Damage Caused by Product Issued by Predecessor, Based on Mere Continuation or Continuity of Enterprise Exceptions to Nonliability," 13 A.L.R.6th 355 (2011). There are, however, several exceptions to this rule. Id. "The mere transfer of the assets of one corporation to

---

[9] I also disagree with the majority that the "amount of damages suffered by the plaintiff" has any relevance to the issue of whether successor liability should be imposed on the defendants, and I conclude, to the contrary, that it does not have any relevance to that issue.

another corporation or individual generally does not make the latter liable for the debts or liabilities of the first corporation except where the purchaser expressly or impliedly agrees to assume the obligations, the purchaser is merely a continuation of the selling corporation, [the companies merged] or the transaction is entered into fraudulently to escape liability." (Internal quotation marks omitted.) *Chamlink Corp.* v. *Merritt Extruder Corp.*, 96 Conn. App. 183, 187, 899 A.2d 90 (2006). "There are two theories used to determine whether the purchaser is merely a continuation of the selling corporation. Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations. . . . Under the continuity of enterprise theory, a mere continuation exists if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." (Citation omitted; internal quotation marks omitted.) Id., 187–88.

As explained by the trial court in this case, quoting *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 920 (Bankr. W.D. Tex. 1995), vacated on other grounds, 220 B.R. 909 (Bankr. W.D. Tex. 1998), "successor liability does not create a new cause of action against the purchaser so much as it transfers the liability of the predecessor to the purchaser. . . . Thus, while successor liability may give a party an alternative entity from whom to recover, the . . . claim [does not] have an existence independent of the underlying liability of the entity that sold the assets." See also generally *Seaboard Air Line Railroad Co.* v. *Coastal Distributing Co.*, 273 F. Sup. 340, 343 (D.S.C. 1967) ("Any other rule would be both

illogical and unjust. In short, if [the entity], through whom liability derives is exonerated, the only rational basis for liability against the party secondarily and derivatively liable is lost.").

In the present case, the plaintiff alleged in her complaint that the defendants were liable for the medical malpractice of Levine and Burke-Howes solely as successors to Shoreline, which was vicariously liable as the employer of Levine and Burke-Howes. She argued before the trial court that the mere continuation exception or the continuity of enterprise exception applied in this case. Even if I were to assume that there were facts sufficient to support either of these exceptions to the rule of nonliability, I, nonetheless, still would conclude that the plaintiff has no viable claim against the defendants under either theory of successor liability, she having voluntarily settled her claim against the predecessor Shoreline, discharged its liability and thus extinguished its liability. See generally *In re Fairchild Aircraft Corp.*, supra, 184 B.R. 920; *Turner* v. *Bituminous Casualty Co.*, 397 Mich. 406, 419, 244 N.W.2d 873 (1976). To the extent that the plaintiff may argue that, because of her voluntary decision to settle rather than to continue to litigate her claims against Shoreline, Levine and Burke-Howes, she did not receive a full recovery, I conclude that this is irrelevant to the analysis required under either theory of successor liability pursued by the plaintiff. Litigants are held to the consequences of their voluntary acts, including settlement. See, e.g., *Cruz* v. *Montanez*, 294 Conn. 357, 382, 984 A.2d 705 (2009); *Soracco* v. *Williams Scotsman, Inc.*, 292 Conn. 86, 97–98, 971 A.2d 1 (2009); *Histen* v. *Histen*, 98 Conn. App. 729, 734, 911 A.2d 348 (2006); *Kondrat* v. *Brookfield*, 97 Conn. App. 31, 44, 902 A.2d 718, cert. denied, 280 Conn. 926, 908 A.2d 1087 (2006); *Doherty* v. *Sullivan*, 29 Conn. App. 736, 741–42, 618 A.2d 56 (1992).

In cases of successor liability based on the mere continuation or continuity of enterprise theories, any liability of the successors necessarily is derivative of and, thus, dependent on the existence of liability of the predecessor; predecessors and successors are not automatically jointly and severally liable as are joint tortfeasors. See generally *In re Fairchild Aircraft Corp.*, supra, 184 B.R. 920; *Seaboard Air Line Railroad Co.* v. *Coastal Distributing Co.*, supra, 273 F. Sup. 343. Moreover, under either theory of successor liability, if there is a remedy available to the plaintiff from the predecessor, the plaintiff first must seek relief from the predecessor. See *Foster* v. *Cone-Blanchard Machine Co.*, 460 Mich. 696, 705–706, 597 N.W.2d 506 (1999). Furthermore, once a predecessor is discharged or otherwise relieved of liability by a plaintiff, especially where a plaintiff is a beneficiary of a settlement payment by the predecessor, the successors also are discharged and thus relieved of liability. See *Craig* v. *Oakwood Hospital*, 471 Mich. 67, 684 N.W.2d 296 (2004); *Foster* v. *Cone-Blanchard Machine Co.*, supra, 705–706. This bar, after discharge of a predecessor, to derivative liability by a successor also is applied in areas of the law not involving predecessors and successors. See *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 715–16, 735 A.2d 306 (1999) ("in the absence of a specific statute, where the liability of a principal for a tort committed by his agent is predicated solely upon the doctrine of respondeat superior, a valid release of either operates to release the other"); *In re Global Crossing, Ltd., Securities Litigation*, 471 F. Sup. 2d 338, 343–46 (S.D.N.Y. 2006) (because of partial settlement that fully released board designee employees from liability, and because defendants' liability on respondeat superior claims entirely is derivative of such liability, release of board designee employees is necessarily release of employers, despite language in settlement agreement that expressly

reserves all rights against nonsettling defendants, including employers); see also *Voris* v. *Molinaro*, 302 Conn. 791, 795–98, 31 A.3d 363 (2011) (settlement of predicate claim extinguishes derivative claim for loss of consortium); *Brooks* v. *Sweeney*, 299 Conn. 196, 222, 9 A.3d 347 (2010) ("[T]he plaintiff's direct liability and indemnification claims against the [defendant] towns are derivative of her claims against [the individual defendants]. In light of our conclusion that [the individual defendants] are entitled to judgment as a matter of law on all claims, the [defendant] towns also are entitled to judgment as a matter of law on the claims asserted against them."); *Duni* v. *United Technologies Corp./ Pratt & Whitney Aircraft Division*, 239 Conn. 19, 30, 682 A.2d 99 (1996) ("[i]n light of the derivative nature of the rights created under [General Statutes] § 31-306 and the public policy considerations involved, we agree with the review board that, under our workers' compensation scheme, an employee, in settling his or her claim for disability compensation, may also compromise his or her surviving dependents' rights under § 31-306"); *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 142–44, 475 A.2d 305 (1984) (where third party defendant's liability derivative of defendant's liability, reversal of judgment against third party defendant benefited defendant); *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 494, 408 A.2d 260 (1979) (because consortium action derivative of injured spouse's cause of action, consortium claim barred after suit brought by injured spouse terminated by settlement or by adverse judgment on merits).

Absent some allegation of fraud or wrongdoing, which wholly is absent from this case, a plaintiff cannot choose to pursue a remedy against a successor if there is a remedy available from the predecessor. See *Foster* v. *Cone-Blanchard Machine Co.*, supra, 460 Mich. 705–706; *Zerand-Bernal Group, Inc.* v. *Cox*, 23 F.3d 159,

163 (7th Cir. 1994) (suggesting that claims based on successor liability not viable where plaintiff "had a chance to obtain a legal remedy against the predecessor, even so limited a remedy as that afforded by the filing of a claim in bankruptcy"). This is unlike a case of joint tortfeasors, where a plaintiff can decide which of the joint tortfeasors it shall pursue and in which order it may do so, even choosing not to pursue one or more of them.

In one of the seminal cases discussing the continuity of enterprise theory of successor liability, albeit in the product liability context, the Michigan Supreme Court explained the reasoning behind recognizing the theory: "To the injured person the problem of recovery is substantially the same, no matter what corporate process led to transfer of the first corporation and/or its assets. Whether the corporate transaction was (1) a traditional merger accompanied by exchange of stock of the two corporations, or (2) a de facto merger brought about by the purchase of one corporation's assets by part of the stock of the second, or (3) a purchase of corporate assets for cash, the injured person has the same problem, *so long as the first corporation in each case legally and/or practically becomes defunct. He has no place to turn for relief except to the second corporation.*" (Emphasis added.) *Turner* v. *Bituminous Casualty Co.,* supra, 397 Mich. 419. "It is an essential condition precedent to imposition of liability on a successor manufacturer under the theory of product line continuation that there be elimination by the successor of an effective remedy against the predecessor, as where a successor purchases the predecessor's assets under an agreement requiring dissolution of the predecessor. . . . The existence of insurance coverage is relevant in determining the availability of a potential remedy against the original manufacturer." 63 Am. Jur. 2d 191–92, Products Liability § 138 (2010).

In the present case, Shoreline did not "become defunct" prior to its settlement, and that of its employees, with the plaintiff for a total of at least $2 million in insurance proceeds, but it continued to exist and to have assets, including but not limited to its insurance coverage after its sale of assets to the defendants.[10]

In a decision subsequent to *Turner*, the Michigan Supreme Court explained in *Foster* v. *Cone-Blanchard Machine Co.*, supra, 460 Mich. 696, that successor liability, based on the continuity of enterprise doctrine, "applies only when the transferor is no longer viable and capable of being sued . . . ." (Internal quotation marks omitted.) Id., 705. The doctrine was recognized by the courts "to provide a remedy to an injured plaintiff in those cases in which the first corporation legally and/or practically becomes defunct." (Internal quotation marks omitted.) Id. "[W]here a plaintiff has . . . successfully pursued a remedy against a predecessor, the policy concerns that underscored the adoption of the continuity of enterprise theory . . . simply are not present." Id., 706. In the present case, it is undisputed that the plaintiff pursued, and eventually received, a substantial settlement payment of at least $2 million from the predecessor Shoreline and its employees.

The Michigan Supreme Court again spoke on the issue of successor liability in *Craig* v. *Oakwood Hospital*, supra, 471 Mich. 98–99, this time in the context of a medical malpractice action, concluding that the plaintiff had failed to demonstrate any reason that the court should apply the doctrine of successor liability

---

[10] Although the record does not reveal the extent of the assets retained by Shoreline, the portions of the asset purchase and sale agreement available in the record indicate that there was attached to the agreement a schedule of "excluded assets" that were not part of the transfer. The exact nature of these "excluded assets," however, is not part of the record. Additionally, as part of the agreement, Physicians purchased Shoreline's assets for a specific purchase price; that price, however, also is not part of the record.

in such cases.[11] The court also determined that even if it were to conclude that the doctrine could apply to such cases, the fact that the plaintiff had obtained a remedy from the predecessor *necessarily barred recovery* from the successor, whose liability solely was based on the liability of the predecessor. Id., 99. The undisputed facts of the present case should lead to the same result as in *Craig*. The plaintiff should not have the ability voluntarily to settle her claims with the predecessor and its employees for the full amount of their insurance coverage and then unilaterally be able to decide to proceed against the presumably deeper pockets of the successors on the basis of signing a covenant not to sue and discharge of liability that purports to reserve her rights to file suit against those successors.

I recognize, however, that there is some variation among our nation's courts as to whether a predecessor must be incapable of furnishing a remedy in order for there to be a viable claim against the successor. See G. Kuney, "A Taxonomy and Evaluation of Successor Liability," 6 Fla. St. U. Bus. L. Rev. 9, 45–47 (2007). "Some courts allow recovery against the successor without addressing whether . . . the predecessor dissolved. At the other end of the spectrum, some courts have held there can be no successor liability unless the predecessor is completely dissolved (regardless of whether . . . it has merely ceased ordinary business operations and exists only as a legal, not a practical, matter). Other courts consider whether the predecessor remains a viable entity capable of providing relief—if it is, then there can be no recovery against the successor; if not, then successor liability will lie. While failure of the predecessor to dissolve may not be fatal in every

---

[11] Whether Connecticut would recognize the successor liability doctrine in a medical malpractice case or would follow decision of the Michigan Supreme Court in *Craig* was not raised by the plaintiff or the defendants and thus cannot be determined in the current posture of this case.

action for continuity of enterprise successor liability, (especially where the predecessor continues as a shell or is otherwise underfunded), the fact that the predecessor remains a viable source for recourse is. This appears to be the most rational approach, in terms of the policies underlying successor liability." Id., 45–46. In light of the factual posture of this case, including the undisputed fact that the plaintiff voluntarily settled her claims with the predecessor and its employees for at least $2 million, the full amount of their available insurance coverage, I agree with the trial court that the plaintiff is not entitled to an additional recovery from the successor defendants that, under either the mere continuation or continuity of enterprise theories advanced by the plaintiff, stand in the same shoes as Shoreline, the predecessor entity.

It is clear that if the defendants had not purchased the assets of Shoreline approximately nine months after the alleged negligence occurred, the plaintiff's recovery from Shoreline and its employees would have been limited to their assets, including their insurance coverage. There is no claim that on the date of the alleged negligence, the defendants had any ownership interest in the shares or assets of Shoreline or owed any duty to the plaintiff or Elijah. There also are no claims by the plaintiff that Shoreline sold its assets to the defendants for an amount materially less than their fair value, that Shoreline received from the defendants for such assets materially less than their fair value, or that there were any other wrongful acts in connection with the asset transaction. Further, the plaintiff does not claim that as of the date of the alleged negligence, the defendants' purchase of Shoreline's assets in any way was foreseeable. Also, the voluntary settlement between the plaintiff, Shoreline and its employees excluded all of Shoreline's assets except the substantial proceeds of

the insurance policies,[12] so the asset transaction between Shoreline and the defendants is irrelevant to and thus does not provide a basis for the plaintiff's claims against the successor defendants, and the plaintiff has not alleged any other substantive basis that would support her claims. Finally, the substantial amount agreed to by the plaintiff is a "viable source of recovery to the plaintiff as a matter of law," as the plaintiff, with the participation of her counsel, affirmatively acknowledged and demonstrated by her own actions in voluntarily settling her claims against the predecessor Shoreline and its employees.[13]

---

[12] When the plaintiff accepted the settlement with Shoreline and its employees and she signed the applicable covenant not to sue, she specifically agreed in the covenant not to sue "to discharge any and all such claims, demands, actions, suits, debts, causes of action and liabilities against all Covenantees, and [she] . . . acknowledge[d] that [she] . . . received consideration for the discharge of all such claims, demands, actions, suits, debts, causes of action and liabilities. . . .

"[She] also [acknowledged that she] under[stood] and affirm[ed] that by executing [the] covenant not to sue, [she was] setting up a complete bar to any recovery at law or in equity for any and all of the claims, demands, actions, suits, debts, causes of action and liabilities against the Covenantees, and [that she was] satisfied with the consideration that [she had] received in exchange for [the] covenant not to sue . . . ."

[13] I also disagree with the majority's analysis of and conclusions about the "covenant not to sue," but in light of the reasons for my determination that the defendants have no successor liability in this case, I do not discuss in any detail the covenant issues and cases set forth in the second part of the majority opinion. However, I note that because of the plaintiff's voluntary settlement with and discharge of Shoreline for the claims it now seeks to pursue against the defendants, the defendants, like Shoreline, have no liability to the plaintiff under either of the exceptions to successor nonliability advanced by her. As the plaintiff's covenant not to sue Shoreline protects it from suit, it also should protect the defendants from suit, because, according to the plaintiff, the successor defendants must stand in Shoreline's shoes because they either are mere continuations of or share a continuity of enterprise with Shoreline. Additionally, regardless of its title, it is the substance of a document that governs its interpretation and application. *McKeon* v. *Lennon*, 131 Conn. App. 585, 628–29, 27 A.3d 436, cert. denied, 303 Conn. 901, 3 A.3d 1178 (2011). In the present case the plaintiff not only covenanted not to sue Shoreline, but she "forever discharge[ed] the Covenantees from all claims, demands, actions, suits, debts, causes of action and liabilities of every name and nature, whether known or unknown, includ-

The unfortunate result of the majority's reversal of the court's decision is to open the door for the plaintiff to seek to obtain an unjustified and unnecessary windfall recovery from two defendants that were uninvolved in the alleged negligence.[14] This court and our Supreme Court have rejected efforts by other parties to obtain a windfall recovery. See, e.g., *Hees* v. *Burke Construction, Inc.*, 290 Conn. 1, 15–16, 961 A.2d 373 (2009) (holding that General Statutes § 20-429 does not preclude trial court from reducing homeowner's damages by amount left unpaid under home improvement contract, otherwise act "could be read to allow a homeowner affirmatively to obtain a free home improvement project from the contractor, rather than simply to prevent the contractor from enforcing otherwise valid claims

ing, but in no way limited to [those] arising from or in any way related to or growing out of, any care and treatment rendered by any or all of the Covenantees to [the plaintiff or Elijah] . . . . It is [the plaintiff's] intent to discharge any and all such claims, demands, actions, suits, debts, causes of action and liabilities against all Covenantees, and [I] hereby acknowledge that [I] have received consideration for the discharge . . . ." See footnote 6 of this opinion. "[W]e interpret contract language in accordance with a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Santana* v. *Hartford*, 94 Conn. App. 445, 463–64, 894 A.2d 307 (2006), aff'd, 282 Conn. 19, 918 A.2d 267 (2007); see also *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 623, 987 A.2d 1009 (2010).

[14] Even accepting the plaintiff's representation that the amount of any damages recovered by her from the defendants would be diminished by the total amount of the previous recoveries by the plaintiff from other sources, any such net recovery from those defendants would still be a windfall because they had no relationship with Shoreline and no duty to the plaintiff or her decedent on the date of the alleged negligence. Also, the plaintiff does not claim in connection with the asset transaction that those defendants did anything fraudulent or otherwise wrongful, so there is no direct claim against the defendants on which their liability can be based. On the basis of the facts submitted in connection with the motion for summary judgment, after having voluntarily settled with Shoreline and its employees, there is no legally cognizable basis for the plaintiff to recover anything from the defendants, and thus the plaintiff's concession that any proceeds received from other entities would be subtracted from any damages assessed against the defendants is legally meaningless in the context of this case.

against the homeowner"; thus, plaintiffs' position "would, in effect, award them an unwarranted windfall that the legislature could not have intended"); *Walpole Woodworkers, Inc.* v. *Manning*, 126 Conn. App. 94, 110, 11 A.3d 165, cert. granted on other grounds, 300 Conn. 940, 17 A.3d 476 (2011); *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 410, 999 A.2d 682 (2010); *Gormbard* v. *Zurich Ins. Co.*, 279 Conn. 808, 828–29, 904 A.2d 198 (2006).

In addition to the lack of legal foundation for the majority's ruling, just as our legislature "[does] not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results"; (internal quotation marks omitted) *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 101, 801 A.2d 759 (2002); this court should not ignore the lack of economic and public policy basis for its ruling in this case. In the absence of some discernable recognized economic or public policy, on the facts of this case, the plaintiff, after receiving at least $2 million from a predecessor and its employees, plus additional settlement funds from other defendants, should not be able to claim, "not enough," and then pursue successor entities that had no relationship to the predecessor on the date of the alleged negligence. The majority's ruling may result in an increase in insurance premiums for many businesses and professional entities to protect against the unjustified, unforeseeable, random and fortuitous claims of other parties against successors acting in good faith to purchase assets, or an increase in financial exposure for entities that do not have applicable insurance coverage.

Accordingly, I respectfully dissent.