**SYENERGY METHODS, INC.**

v.

**KELLY ENERGY SYSTEMS, INC., et al.**

**Civ. A. No. 83–0697 P.**

United States District Court, D. Rhode Island.

April 20, 1988.

---

David Oliveira, Richard MacAdams, Providence, R.I., for plaintiff.

Michael DeFanti, Providence, R.I., David R. Melton, Barnes & Thornburg, South Bend, Ind., Donald D. Evenson, Barnes & Thornburg, Washington, D.C., Bobby Gillenwater, Fort Wayne, Ind. for defendants.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

The present motion for issuance of an order to show cause why defendant should not be adjudged in contempt is a response to a recent action filed in the District of Connecticut which grows out of and is intimately related to an earlier case in this court that was settled by agreement of the parties in December, 1985. The earlier case concerned and the pending Connecticut case continues to concern a patented roofing system. The holder of this patent, # 4,162,597, is Thomas L. Kelly who attempted then and continues to attempt now to put it to profitable use through his company Kelly Energy Systems, Inc. [hereinafter KES]. In the earlier case, as in the pending one, Mr. Kelly claimed that his patent has been and is now being infringed in Connecticut. In the earlier case, Mr. Kelly alleged the infringers of his patent were Syenergy Methods, Inc., a Rhode Island corporation [hereinafter SM–RI] and its three stockholders Joseph Vuono, Paul Pattek and Douglas Creed. In the pending action, Mr. Kelly alleges the infringer of his patent is Syenergy Methods, Inc., a Connecticut corporation [hereinafter SM–C]. For reasons that will become apparent below, however, Mr. Kelly does not claim that SM–C's sole stockholder and director, Douglas Creed, the same individual who had been a stockholder of SM–RI, is also an infringer of the patent. The earlier case was settled by an agreement that included, *inter alia*, a covenant not to sue: for good consideration Mr. Kelly agreed not to sue SM–RI, Joseph Vuono, Paul Pattek or Douglas Creed, individually or collectively, or any customers or users of their products arising out of matter relating to Patent # 4,162,597. In the present motion the issue presented is whether the covenant not to sue given in the earlier case prevents suit against SM–C in the pending Connecticut case and, therefore, whether Kelly and KES are in contempt of the settlement

agreement. Thus does the conclusion of the earlier case bring us to determine the possibility of validity beginning the pending one.

### The Transaction

In December, 1986, Douglas Creed incorporated SM–C for the purpose of acquiring the roofing division of SM–RI. The sale of this division was completed by the first of the year. Accordingly, in 1987, SM–C began to offer for sale a system of roofing in all respects identical to that which had been formerly offered for sale by SM–RI. Subsequent to this purchase, moreover, SM–RI ceased its roofing business and discontinued offering for sale the roofing system which had been the subject of controversy in the earlier action. From these facts, it is readily apparent that a principal of SM–RI has formed a new corporation with which to continue the roofing business of SM–RI in the same market in which SM–RI had been engaged. It remains only to elaborate the implications of this observation.

### Sale or Merger

Defendants argue that the fact that SM–C is a new corporation disposes of the matter because the covenant not to sue was made with a different legal entity. We do not agree that the question is so simple. The covenant not to sue had relevance only to the roofing division of SM–RI. This division was the asset bought by SM–C which then continued its operation. Just as the change in legal form of a business from a partnership to a corporation does not affect the rights held under a contract, see *Walker v. Mason*, 272 Pa. 315, 116 A. 305 (1922); *Bradford & Carson v. Montgomery Furniture Co.*, 115 Tenn. 610, 92 S.W. 1104 (1905), so the rights held by an incorporated business should not be affected by its continuation under a new corporate form. This latter insight has been recognized by the First Circuit in the context of debt and liability, *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 692 (1984), although we believe it is equally true in a context of rights and other contractual entitlements.

In *Dayton,* the First Circuit noted that "[t]he general rule in the majority of American jurisdictions ... is that 'a company which purchases the assets of another company is not liable for the debts and liabilities of the transferor.'" *Id.* The First Circuit continued, however, that this "general rule is subject to four well-recognized exceptions, permitting liability to be imposed on the purchasing corporation." *Id.* Of these four exceptions, only two are relevant here. The first applies "when the transaction amounts to a consolidation or merger of the purchaser and seller corporations." *Id.* The second exception applies "when the purchaser corporation is merely a continuation of the seller corporation." *Id.*

The first exception is known as the de facto merger doctrine. "The de facto merger doctrine refers to a set of case law principles to the effect that certain corporate transactions that are not mergers in the technical statutory sense will nevertheless be treated as functionally equivalent to them." Clark, *Corporate Law* 458 (1986). In its essentials the de facto merger doctrine applies to construe a sale of assets as a merger when four conditions are met: (1) when the purchaser corporation retains key personnel from the seller corporation; (2) when a common identity of ownership exists between the purchaser and seller corporations; (3) when the purchaser corporation employs the purchased assets to continue the normal business operations of the seller corporation, and (4) when the seller corporation ceases its ordinary business operations in the area in which the sold assets were used. See *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457–58 (11th Cir.1985); *Keller v. Clark Equipment Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983) cert. den. 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984); *Atlas Tool Co., Inc. v. Comm'r of Internal Revenue*, 614 F.2d 860, 870 (3d Cir.1980).

Two comments on the application and use of this doctrine are in order. First, courts often speak as if a requirement for the application of the de facto merger doctrine is that the purchaser corporation has

assumed the debts and liabilities of the seller corporations. Clearly what must be meant when a court expresses this requirement is that the purchaser corporation must be continuing the normal business operations of the seller corporation: a factual observation, not a legal conclusion. To interpret this requirement in any other way would be circular: stating a legal conclusion that flows from an application of the de facto merger doctrine as a condition precedent or premise for that very application from which it flows. See, e.g., *United States v. Oil Resources, Inc.*, 817 F.2d 1429, 1434 (9th Cir.1987) (employing de facto merger doctrine to impose liability for debts of seller corporation or purchaser corporation); *Knapp, Jr. v. North American Rockwell Corp.*, 506 F.2d 361, 367–70 (3d Cir.1974) (employing de facto merger doctrine to impose tort liability of seller corporation on purchaser corporation).

A comment on the fourth condition, that a seller corporation cease its ordinary business operations in the area in which the sold assets were used, is also necessary. Typically, courts have understood this condition as requiring that the seller corporation sell all of its assets and then dissolve as soon as it is legally and practicably possible. We believe this interpretation of the fourth condition is too strong.

■ The highly sophisticated economic environment of contemporary business has led to the creation of arcane and manifold corporate structures of such daunting complexity as to bear little or no resemblance to the relatively simple corporate entities developed by the great industrialists of the previous century. One need only observe the managerial matrix and financial infrastructure of the modern multinational to be overawed by the creative potential of the human mind when adapting to an uncertain and hostile environment. Corporate identify, no longer an industrial reality, has become a financial abstraction. No longer can one assume that a single corporation engages in a single enterprise. The contemporary corporation may have many different divisions, each one participating in a wholly separate and distinct market or industry from all of the others. Accordingly, we believe that the policies and purposes of the de facto merger doctrine require that this doctrine be applied not only to the sale of assets constituting an entire corporation with its subsequent dissolution, but to the sale of assets constituting a corporate division as well.

Applying the de facto merger doctrine to the present case we note that key personnel were retained. Douglas Creed an officer and director of SM–RI is the sole director of SM–C. Moreover, we note that a common identity of ownership exists between the two corporations. Douglas Creed was one of the three stockholders of SM–RI and is currently the sole stockholder of SM–C. We note also that SM–C has continued the normal business of SM–RI. SM–C has continued to sell the roofing system in Connecticut. Finally, we note that SM–RI has exited the roofing business following the sale of its assets associated with its prior activity in the roofing industry. Thus, we find that a merger rather than a sale has occurred under the de facto merger doctrine.

■ The second exception stated by the First Circuit in *Dayton* to the general rule that a company which purchases the assets of another company is not liable for the debts and liabilities of the transferor is known as the continuation doctrine. The continuation doctrine states that when the purchaser corporation is merely a continuation of the seller corporation then liability exists. According to the First Circuit " '[t]he key element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.' " *Dayton*, 739 F.2d at 693. As already noted under the application of the de facto merger doctrine, these key elements of a continuation exist in the case at bar.

Thus, under either exception stated by the First Circuit, if this were a case involving debt or other liability, the sale of assets sold by SM–RI to SM–C would permit the imposition of the debts and liabilities of SM–RI onto SM–C. We believe, moreover, that if under these circumstances the debts

and liabilities of the selling corporation would pass to the purchasing corporation, then the symmetries of justice require that the rights and other contractual entitlements of the selling corporation, unless expressly reserved, must pass as well. Accordingly, it remains only to consider whether SM–RI's right not to be sued by Mr. Kelly passed to SM–C.

### The Covenant Not to Sue

██ A covenant not to sue is a contract. Thus, whether the right not to be sued passes to SM–C depends on whether the covenant not to sue is assignable. Defendants argue that the covenant not to sue must be construed as a patent licensing agreement. Even if this is so, however, we do not believe it settles the matter. Although the Sixth Circuit has held that a patent licensing agreement does not pass by operation of law in a merger situation, *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090 (6th Cir.1979), we do not believe the rule to be so absolute. As Justice Traynor observed in *Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335, 182 P.2d 182 (1947), "if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract." Id. at 344–45. Thus, even if the covenant not to sue is construed as a patent licensing agreement and the general rule is that agreements granting patent licenses are personal and not assignable unless expressly made so, *Unarco Industries, Inc. v. Kelley Co.*, 465 F.2d 1303, 1306 (7th Cir. 1972) cert. denied 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973), we do not believe that this rule controls when the assignment results from a transformation of the legal form of the assignee. In other words, where there has been a continuation, the argument that the patent license is not assignable is inapplicable. The general rule must be tempered by the sound and judicious principle articulated by Justice Traynor.

Applying this principle to the present case we find no change in the protected interests of the parties. SM–RI operated in Connecticut; SM–C operates in Connecticut. SM–RI sold a particular roofing system; SM–C continues to sell this roofing system. Defendants competed with SM–RI in this market and continue to compete with SM–C. We can discern no relevant change in the situation that might affect the interests of the parties. A change in legal form is simply that: a change in form, not in substance. Defendants can not be permitted to dispute the terms of a legitimate agreement when no substantial basis exists for such a dispute.

### Contra Creed

██ We note also, although find no need to discuss, that plaintiffs attempt to avoid the covenant not to sue Douglas Creed by the blatantly procedural maneuver of not naming him as a defendant in their suit against SM–C will not bear scrutiny. Douglas Creed is the sole director of SM–C. Moreover, he is the sole stockholder of SM–C. There is simply no perspective from which we could view the present suit against SM–C as being anything other than a suit in reality against Douglas Creed and therefore a violation of the covenant not to sue.

### Order

For the foregoing reasons, the motion of plaintiffs for the issuance of an Order compelling defendants KES and Mr. Kelly to show cause why they should not be adjudged in contempt of the settlement order is granted; the same is set down for hearing on Tuesday, May 17, 1988 at 2:00 p.m.

The settlement order has been resealed. Counsel are ordered to confer before May 17 to attempt a resolution of this controversy.