No. 127,514

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NCR Corporation,
*Appellee*,

v.

Raytheon Company,
*Appellant*,

v.

Kansas Department of Health and Environment,
*Appellee*.

SYLLABUS BY THE COURT

1.

Appellate courts exercise unlimited review over an agency's decision to grant summary judgment, assessing whether there are any genuine issues of material fact to be resolved and whether a party is entitled to judgment as a matter of law.

2.

The general rule of liability for transfer of assets in Kansas is that where one corporation sells or otherwise transfers its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor.

3.

Kansas courts have recognized four equitable exceptions to the general rule of nonliability for asset transfers. These exceptions may impose liability on a successor company when (1) the purchaser expressly or impliedly agrees to assume the seller's debts; (2) the transaction amounts to a consolidation or merger of the corporation; (3) the

purchaser is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts.

4.

The exceptions to the general rule of nonliability for asset transfers may apply when a corporation transfers the assets of a single division, rather than the entire corporation.

5.

Summary judgment is not appropriate when there are disputed material facts in the case—even when a court or other tribunal believes, based on the weight of the evidence, that a party will ultimately prevail on the merits.

Appeal from Shawnee District Court; THOMAS G. LUEDKE, judge. Oral argument held July 8, 2025. Opinion filed May 1, 2026. Reversed and remanded with directions.

*Zach Chaffee-McClure, James F. Thompson,* and *Dalton R. Mott*, of Shook, Hardy & Bacon LLP, of Kansas City, Missouri, for appellant.

*David E. Romine*, pro hac vice, and *Larry D. Silver*, pro hac vice, of Langsam Stevens Silver & Hollaender, LLP, of Philadelphia, Pennsylvania, and *David M. Traster*, of Foulston Siefkin LLP, of Wichita, for appellee NCR Corporation.

*John N. Truong* and *Daniel Volin*, of Kansas Department of Health and Environment, for appellee KDHE.

Before WARNER, C.J., BRUNS and BOLTON FLEMING, JJ.

WARNER, C.J.: When the Kansas Department of Health and Environment (KDHE) discovers an environmental hazard requiring remediation, it may issue an administrative order directing the entity that caused the contamination to rectify it. But sometimes the

agency discovers contamination decades later, and the entity responsible for the contamination no longer exists. Who then bears the liability?

This question of successor liability—an equitable concept that seeks to ascertain whether a corporation that merges with another company or purchases its assets should also shoulder its legal liabilities—lies at the heart of this appeal. In the 1960s, a now-defunct company named Standard Precision, Inc., engaged in practices that caused radioactive contamination at a location in Wichita. Through a series of mergers and corporate reorganizations, Standard Precision became a division of a different company. The assets of that division were then transferred to NCR Corporation, the parent company of the transferor. Raytheon Company later merged with the transferor, acquiring its remaining assets (but not the Standard Precision business).

An administrative law judge (or ALJ) reviewed this history and granted summary judgment for NCR and against Raytheon, concluding the transfer of the Standard Precision *division* could not transfer liability for that division's previous practices. Raytheon appeals, arguing the ALJ misinterpreted Kansas law on successor liability. It also contends the ALJ erred in granting summary judgment in favor of NCR because the agency had found that contaminated groundwater at the location contained the same type of chemicals NCR had used in its work there, regardless of Standard Precision's actions.

We agree with Raytheon on both counts. Kansas law employs a practical approach to successor liability—one that recognizes, in a world where corporations participate in increasingly complex practices and pursue diversified interests, that the transfer of a corporate division may also transfer the liability for that division's actions. The ALJ's ruling did not recognize this flexibility and thus was based on a legal error that requires reversal. And a genuine issue of material fact regarding the chemicals at the Wichita location precluded summary judgment on NCR's independent liability for contamination. We thus reverse the administrative ruling and remand the case for further proceedings.

3

In 2017, KDHE issued a unilateral administrative order against both NCR and Raytheon regarding the presence of volatile organic chemicals (VOCs) in the groundwater at an industrial facility located at 4105, 4125, and 4129 West Pawnee in Wichita (the Site). KDHE asserted in its order that a now-dissolved company named Standard Precision, Inc., originally caused the contamination. The order identified both NCR and Raytheon as parties responsible for the contamination—NCR as "a successor to Standard Precision" and Raytheon from having "assumed the liabilities of Standard Precision" through "a series of surviving corporations."

*Operations lead to contamination at the Site.*

Standard Precision was founded in 1948. The company had two primary businesses—the sale and distribution of aviation supplies, parts, and hardware, and the repair and remanufacture of aircraft instruments. In 1959, Electronic Communications, Inc. (ECI), acquired all the outstanding stock of Standard Precision—making Standard Precision a wholly owned subsidiary of ECI. Then in 1965, ECI's board of directors voted to liquidate and dissolve Standard Precision and transfer all its assets to ECI. In this vote, the board agreed that "ECI shall assume payment of all liabilities and performance of all obligations, if any, of Standard [Precision] of every description, whether absolute or contingent." Following this transfer, ECI organized Standard Precision's assets in a division within ECI's Standard Precision Division.

In 1962, Standard Precision entered into a lease agreement with Consolidated Equipment Co., Inc. (CECO), the owner of the Site. Standard Precision's activities at the Site consisted "principally of the production of instruments and electro-mechanical

4

equipment for the aerospace and general aviation industries," including "the overhaul of aircraft instruments."

This overhaul consisted of, among other things, a practice of stripping radium paint off radioluminescent airplane dials. Standard Precision applied for a radioactive-materials license in 1965, after KDHE informed Standard Precision that there were radioactive materials on the parts that it was stripping. Thus, Standard Precision was already stripping the dials before it applied for the license—but it is unclear for how long. The stripping took place in a dedicated room, and Standard Precision would drain the solvent used to strip radium paint off the dials into an underground concrete sump tank through a floor drain.

This practice continued, despite the name of the company and division changing multiple times over the next several years. KDHE completed an inspection in 1966, and Standard Precision—now "Standard Precision, a Division of [ECI]"—reapplied for a radioactive-materials license in 1967. KDHE granted the license through 1970.

In 1969, KDHE completed another inspection and noted that "the area formerly called the stripping room has been remodeled and was now being prepared for use as a storage area." As a part of the remodel, the floor drain was "cement[ed] up." During the following year's inspection, KDHE noted that the Standard Precision Division was "no longer involved with dial stripping or any other work using radioactive material." At that point, the "only inventory of radioactive material at present consist[ed] of [five] aircraft instruments left over from past stripping operations." The Standard Precision Division asked to renew its license, stating that there had "been no change in our program at this time and we do not anticipate any changes in the near future." KDHE renewed the license for two more years.

*ECI is acquired by NCR.*

In 1968, while Standard Precision was conducting its work at the Site, NCR began purchasing ECI's stock through a stock tender offer. By the end of 1971, NCR had acquired approximately 99.8% of ECI's shares. In December 1971, NCR created a wholly owned subsidiary to merge with ECI and become the surviving corporation. This merger was executed using a three-step plan:

- *First*, NCR created a wholly owned subsidiary—ECI Merger Corp. (what we call New ECI)—to merge with ECI (or Old ECI) and become the surviving corporation.

- *Second*, all shares of Old ECI common stock held by NCR at the time of the merger were canceled. NCR did not receive any payments for the former shares, but the minority shareholders with the 0.2% of shares not held by NCR received cash payments, leaving NCR as the sole shareholder of the surviving corporation.

- *Third*, New ECI issued a "declaration and payment . . . of a dividend in kind consisting of the Wichita assets"—that is, "the assets presently constituting ECI's Standard Precision Division at Wichita, Kansas"—to NCR. The plan explained that because NCR, Old ECI, and New ECI "are or will be all members of a consolidating group for U.S. tax purposes, the conveyance of the Wichita assets by the surviving corporation to NCR as its sole shareholder will constitute a non-taxable transaction."

By early January 1972, NCR had absorbed New ECI as a wholly owned subsidiary and taken control of the Standard Precision Division, renaming it the "NCR Data Terminals Division Wichita plant." By the time NCR took over the Standard Precision Division in 1972, at least two years had passed since the division had ceased its dial-

stripping operation. In 1973, KDHE advised NCR that it was canceling the radioactive-materials license.

*NCR sells New ECI to E-Systems, which is then acquired by Raytheon.*

In 1976, NCR sold New ECI to E-Systems, Inc. E-Systems then merged with New ECI, leaving E-Systems as the surviving corporation. During this merger, E-Systems agreed that "all debts, liabilities, and duties of ECI shall thenceforth attach to the Surviving Corporation and may be enforced against it to the same extent as if such debts, liabilities, and duties had been incurred or contracted by it."

In 1995, E-Systems merged with a wholly owned subsidiary of Raytheon, making it a subsidiary of Raytheon. E-Systems later changed its name to Raytheon E-Systems, Inc. Raytheon E-Systems then merged with Raytheon a few years later.

KDHE'S INVESTIGATION AND ORDER

Beginning in the 1990s, KDHE conducted an environmental investigation that identified radium and several VOCs in the groundwater at the Site. As part of that investigation, KDHE requested information from NCR about the possible sources of the groundwater contamination. An NCR employee provided an affidavit describing interviews with former employees, stating:

- Up to a dozen barrels at a time were located along the south side of the building. The interviewees either did not know or could not recall the barrels' contents.

- The interviewees identified several materials used at the site, including "machine shop cutting oils (water soluble and regular cutting oils); isopropyl alcohol;

[Naphtha]; Chlorthane Nu, used to clean parts on the production lines; and possibly some lubricants for printer mechanisms."

- No one recalled any use of the sanitary or storm sewer system for the disposal of any materials, nor did they recall any underground or above ground storage tanks at the facility.

The affidavit noted that "[i]t was difficult to make distinction between the operations of Standard Precision and [NCR] because the majority of the interviewees worked for both entities."

In December 2017, KDHE issued its order identifying radium and VOCs at the Site. The order stated that there were "extremely high concentrations" of these chemicals near "an abandoned sump" as "a source of the groundwater contamination." It also indicated that the United States Environmental Protection Agency (EPA) completed a removal action of radium-contaminated soil around the former sump in 2012. At that time, the EPA reported to KDHE that "the soil around the inside sump exhibited a strong solvent odor and field screening detected high levels of VOCs in the soil." But the EPA only addressed the presence of radium—not solvents—during the excavations.

KDHE's order found that both NCR and Raytheon were responsible for the contamination—NCR as "a successor to Standard Precision, Inc." and Raytheon from having "assumed the liabilities of Standard Precision, Inc." through "a series of surviving corporations." KDHE thus ordered NCR and Raytheon to remediate the Site.

ADMINISTRATIVE AND JUDICIAL REVIEW OF THE ORDER

NCR and Raytheon each requested an administrative hearing on the KDHE order, and the matter was assigned to an ALJ.

*A federal lawsuit is dismissed on abstention grounds.*

While the administrative action was pending, Raytheon filed a lawsuit in federal court against NCR, CECO (the owner of the Site), and a trust associated with CECO's owner to determine who was responsible for the contamination identified in KDHE's order. The ALJ agreed to stay the administrative proceedings pending resolution of the federal lawsuit.

Following a motion to dismiss by the defendants, the federal district court issued an order abstaining from hearing the case based on principles outlined in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943), so our state could "apply a coherent policy with respect to environmental hazards that are of substantial public concern." The order also made two findings relevant to the current appeal:

- The order stated that from 1954 through 1962 and 1977 through present, "CECO and the Trust and their predecessors conducted heavy tool and die manufacturing at the Site. This also caused contamination of the Site."

- In 2006, "KDHE reached a settlement with CECO and the Trust, resolving liability relating to the Site for those entities." Through this settlement, KDHE agreed not to take any action against CECO and to protect CECO against contribution claims from any other persons responsible for the contamination.

The federal court dismissed the case without prejudice, and the ALJ lifted the stay on the administrative challenge to KDHE's order.

*The ALJ grants summary judgment against Raytheon.*

KDHE, Raytheon, and NCR all participated in the administrative action before the ALJ. Eventually, all three parties filed motions for summary judgment based on a set of agreed-upon exhibits.

KDHE argued in its motion for summary judgment that either Raytheon or NCR was responsible for Standard Precision's contamination activities. KDHE primarily argued that Raytheon was a successor to liability for Standard Precision and Old ECI's contamination of the Site through the series of mergers from New ECI to E-Systems and E-Systems to Raytheon. But it alternatively argued that if Raytheon was not liable for that contamination, NCR was the responsible party. KDHE also asserted that NCR was directly responsible for some of the contamination at the Site because it had operated the Site for months before KDHE terminated the radioactive-materials license, and "NCR had some radioactive material" and "itself used solvents in its operations" at the Site.

NCR argued that it was not liable for the acts of its subsidiary—New ECI—and that the dividend making up some, but not all, of the Standard Precision Division's assets did not transfer ECI's liability for Standard Precision's actions to NCR. Instead, NCR asserted that Raytheon had assumed liability for Standard Precision's contaminating practices, arguing that this liability passed from ECI to E-Systems to Raytheon E-Systems to Raytheon. NCR also challenged KDHE's finding that NCR was independently liable for some of the contamination at the Site, arguing that it never used the radioactive-materials license and that all radium stripping ceased before NCR acquired stock in ECI.

Raytheon argued that NCR, and not Raytheon, had assumed Standard Precision's business and liabilities. Raytheon argued that through a plan of consolidation and reorganization, NCR acquired the entire business—not merely the assets—of Old ECI's Standard Precision Division. Raytheon also argued that there was evidence showing NCR

10

was independently responsible for the contamination, given its work with solvents containing VOCs after it began working at the Site in the 1970s. Finally, although it did not seek summary judgment on this issue, Raytheon questioned whether the previous settlement agreement between KDHE and CECO was enforceable against it, when Raytheon had not been a party to that settlement and had not received notice of the settlement when it was reached.

The parties engaged in extensive briefing on these motions. Ultimately, the ALJ found that Raytheon—not NCR—was the successor in liability to Standard Precision and granted judgment against Raytheon and in favor of NCR on all issues. To reach this conclusion, the ALJ found that Standard Precision's liabilities were assumed by Old ECI when it dissolved Standard Precision and created the Standard Precision Division in 1965, and New ECI became responsible for those liabilities when it merged with Old ECI in 1971. But the ALJ concluded that because New ECI remained a wholly owned subsidiary of NCR, NCR never became responsible for its liabilities. Instead, those liabilities transferred to E-Systems (and ultimately then to Raytheon) when it later merged with New ECI. The ALJ thus found that "NCR managed to acquire the assets of [the Standard Precision Division] from ECI without also being saddled with the liabilities, which would include liabilities for any contamination caused by [the Standard Precision Division] as a division of ECI."

The ALJ also found that there was no evidence to suggest that NCR was directly responsible for any of the contamination at the Site, pointing out that the sump tank was the source of that contamination and noting that the drain to the sump tank was cemented over before NCR took over the Site.

The Secretary of KDHE issued a final order affirming the ALJ's decision.

11

*The district court affirms the agency action.*

Having received no recourse before the agency, Raytheon filed a petition for judicial review of these administrative actions in district court under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. Raytheon argued that the ALJ's decision and final agency action erred in applying Kansas law on successor liability and improperly issued rulings on summary judgment when there were disputed issues of fact. See K.S.A. 77-621(c)(4) (relief available when an agency erroneously interprets or applies the law); K.S.A. 77-621(c)(8) (relief available when an agency action is unreasonable, arbitrary, or capricious).

The district court ultimately disagreed and denied the relief requested in Raytheon's petition. In doing so, the court made three rulings that Raytheon now challenges on appeal.

*First*, the district court found that NCR was not the successor in liability to Standard Precision because NCR had never merged with Old ECI (which owned the Standard Precision Division). Instead, NCR created a new entity that would become its wholly owned subsidiary (New ECI), and that new entity merged with Old ECI. While the court acknowledged that New ECI later transferred all the assets of the Standard Precision Division to NCR, it found that the purchase or transfer of a *division* was not sufficient to transfer liability for that division under Kansas law. The court thus ruled that even though NCR had acquired all of Standard Precision's assets, Standard Precision's liabilities remained with New ECI and its corporate successors through the mergers to E-Systems and Raytheon.

*Second*, the district court found that while NCR used solvents containing VOCs after its acquisition of New ECI in the early 1970s, the environmental contamination identified by KDHE was "only associated with the sump" at the Site. And the sump had

12

been sealed with concrete before NCR began any activity. The court thus found that there was "no evidence" before the agency proving that NCR was independently responsible for the contamination.

*Third*, the district court found that Raytheon's challenges to the previous settlement between KDHE and CECO were not properly before the court, as those issues had not been resolved by the agency in its order.

Raytheon appeals, challenging each of these three rulings. We will discuss portions of the ruling in greater detail as they become relevant in this opinion.

DISCUSSION

The KJRA defines the scope of judicial review of agency actions in our state. K.S.A. 77-603(a). A district court reviewing an agency decision may grant relief only if it determines one of the errors listed in K.S.A. 77-621(c) has occurred. In an appeal from an administrative decision under the KJRA, this court exercises "'the same statutorily limited review of the agency action as' the district court, deciding the case 'as though the appeal had been made directly to the appellate court.'" *Hanson v. KCC*, 58 Kan. App. 2d 82, 91, 464 P.3d 357 (2020), *aff'd* 313 Kan. 752, 490 P.3d 1216 (2021). The party asserting the invalidity of the agency's action bears the burden of proving the action was invalid. K.S.A. 77-621(a)(1).

In its petition to the district court, Raytheon sought relief based on its allegation that the ALJ (and Secretary of KDHE) had committed legal errors, K.S.A. 77-621(c)(4), or had otherwise acted unreasonably, arbitrarily, or capriciously, K.S.A. 77-621(c)(8). In its appeal to this court, Raytheon's arguments have expanded somewhat, now asserting additional bases for relief in K.S.A. 77-621(c)(1), (c)(5), and (c)(7). NCR and KDHE challenge this expansion, claiming our review is limited to the original legal bases

13

Raytheon presented in the petition and argued to the district court. We need not resolve this preservation matter, however, because the issues before us—which concern the agency's summary judgment rulings—present questions of law that may be reviewed under K.S.A. 77-621(c)(4).

The standards for summary judgment in our state are well established. A party seeking summary judgment must show there are no disputed questions of material fact—meaning that there is nothing the factfinder could decide that would change the outcome of the case—and that the movant is entitled to judgment as a matter of law. *Ross v. Nelson*, 319 Kan. 266, 272-73, 554 P.3d 636 (2024). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of every reasonable inference drawn from the evidence. 319 Kan. at 272-73. Because summary judgment is only appropriate when there are no material factual questions remaining to be resolved, appellate courts apply these same standards during our review, giving no deference to the earlier ruling. 319 Kan. at 273; *Sheldon v. KPERS*, 40 Kan. App. 2d 75, 80, 189 P.3d 554 (2008).

In the parties' briefing, Raytheon and NCR acknowledge that an agency's decision to grant summary judgment is subject to unlimited review by an appellate court. KDHE asserts that the agency's ruling should be given more deference, given the agency's expertise in the area of environmental contamination.

It is true that our Kansas Supreme Court has recognized that agency rulings within an agency's area of expertise are "'entitled to some deference.'" *Hanson v. Kansas Corp. Comm'n*, 313 Kan. 752, 763, 490 P.3d 1216 (2021). But courts do not defer to agencies' interpretation of the law. See *Landrum v. Goering*, 306 Kan. 867, 875, 397 P.3d 1181 (2017). And our court has long recognized that we review an agency's summary judgment using the same standards applicable to district courts. See *Sheldon*, 40 Kan. App. 2d at 80-81. In other words, we assess "whether, resolving all facts and reasonable

14

inference from the facts in favor of the nonmoving party, there exists a genuine issue of material fact and whether the party who prevailed before the agency was entitled to judgment as a matter of law." 40 Kan. App. 2d at 81.

The ALJ's summary-judgment ruling concluded that there were two overarching legal questions in this case: whether the Site was contaminated and, if so, which entity or entities were legally liable for that contamination. No one challenges the ALJ's findings on the first question—that KDHE's order correctly concluded that the Site was contaminated with radium and VOCs, and thus remediation of the Site is necessary to protect Kansans' health and the environment. Instead, the issues in this appeal concern the second question—who must pay for that remediation?

The ALJ found that Raytheon, and not NCR, assumed the liability for the contamination from Standard Precision's radium-stripping activities. Raytheon argues that this ruling was based on three legal errors that require reversal.

- Raytheon asserts that the agency's ruling incorrectly found that Kansas law did not recognize the possibility of successor liability when a corporation acquires a division of another company (as Raytheon asserts NCR did here with the previous Standard Precision Division) but does not effect a complete merger of the two entities.

- Raytheon claims that the existence of the same VOCs in the groundwater that were also in the solvents NCR independently used after it began its work at the Site in the 1970s raised a factual question about whether NCR was responsible for some portion of that contamination, rendering summary judgment inappropriate.

15

- Independent from its claims regarding NCR, Raytheon asserts that it should not be precluded from arguing that CECO is also responsible for any contamination at the Site and is not bound by KDHE's previous settlement with the Site owner.

After carefully reviewing the agency record and the parties' arguments, we agree with Raytheon that summary judgment was premature for the first two of these reasons. We decline to consider Raytheon's third argument.

1.  *The agency erroneously interpreted the law when it found that successor liability can never follow the acquisition of a corporate division.*

Raytheon's primary argument on appeal is that the ALJ erred as a matter of law in granting summary judgment in favor of NCR and against Raytheon. The ALJ reached this decision after rejecting Raytheon's arguments concerning NCR's potential liability—based on a claim that NCR's acquisition of ECI as a wholly owned subsidiary was a de facto merger and that NCR continued the operation of the previous Standard Precision Division when it acquired its assets—because both arguments hinged on the possibility that something less than a complete merger can transfer liability. The ALJ found that Kansas law did not recognize the potential for successor liability "when a corporation gives away assets of a single division rather than the entire corporation." We disagree.

For more than a century, Kansas courts have found that when "a new company actually purchases [assets] from an old one, . . . there is no liability for the debts of the old, unless the new company assumes them as part of the consideration" of the transaction. *Spadra-Clarksville Coal Co. v. Kansas Zinc Co.*, 93 Kan. 638, 647, 145 P. 571 (1915). We describe this principle as a "general rule of nonliability of a transferee corporation for the prior debts of the transferor." *Comstock v. Great Lakes Distributing Co.*, 209 Kan. 306, 310, 496 P.2d 1308 (1972).

16

But this general rule of nonliability has never been absolute. For example, the Kansas Supreme Court explained almost 90 years ago that the general rule assumes that "the contracting corporations and their representatives are dealing with each other at arm's length, and where each side is looking out for the interest of its own corporation." *Avery v. Safeway Cab, Transfer & Storage Co.*, 148 Kan. 321, 325, 80 P.2d 1099 (1938). And the general rule "cannot be applied when the negotiators for both corporations are the same or virtually the same, and the transfer of assets is made merely for their own convenience and advantage." 148 Kan. at 325.

1.1.   *The Kansas Supreme Court's decision in* Comstock *shows that courts flexibly construe the exceptions to nonliability.*

More recent cases refer to the exceptions to nonliability as the *Comstock* exceptions, after the Kansas Supreme Court's landmark decision in 1972. The plaintiff in *Comstock* was injured when an automobile jack collapsed. The jack had been manufactured by Vulcan Manufacturing Company, which had long been experiencing financial difficulties. Sometime after the jack was produced and sold, but before the plaintiff's injury, Vulcan sold several pieces of equipment to an unrelated company— Great Lakes Distributing. Great Lakes then leased some of the space Vulcan had previously used and started manufacturing and selling jacks. The *Comstock* plaintiff argued that Great Lakes' purchase of this equipment, accompanied by its decision to start manufacturing jacks, showed that it had essentially merged with Vulcan and should shoulder Vulcan's liabilities.

The *Comstock* court did not find these arguments persuasive. The court observed that all the parties involved in that case agreed with "the general rule of nonliability of a transferee corporation for the prior debts of the transferor and the exceptions thereto." 209 Kan. at 310. The court then relied on language from a treatise to capture the equitable exceptions to the nonliability rule recognized to that point:

17

"'Generally where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation [what other courts have described as a de facto merger]; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.'" 209 Kan. at 310 (quoting 15 Fletcher Cyc. Corp. [Perm. ed.] § 7122, p. 187).

*Comstock* then analyzed whether the sale of the Vulcan equipment to Great Lakes, along with Great Lakes' other actions, fell within any of these equitable exceptions to the general rule of nonliability for asset transfers. In particular, the court considered whether the transaction was a de facto merger (the second exception) or amounted to a mere continuation of Vulcan's business (the third exception). The court found that there was "no evidence that any assets, tangible or intangible, passed directly from Vulcan to Great Lakes" and no evidence "that any of the original purchasers of Vulcan's property . . . acted as 'strawmen' to accomplish a transfer of ownership from Vulcan to Great Lakes." 209 Kan. at 311. Rather, the evidence showed that "Great Lakes acquired the machinery and equipment as a bona fide purchaser." 209 Kan. at 311. Thus, the court concluded that the "acquisition of some Vulcan property by Great Lakes, under the circumstances described, does not tend to show a consolidation, merger or mere continuation as those terms have been defined." 209 Kan. at 312.

As in *Comstock*, the parties in the case before us recognize that these general principles and exceptions apply in determining whether a successor corporation is liable for the debts of its predecessor. But NCR argues—and the ALJ, Secretary, and district court found—that based on the treatise language from *Comstock*, these exceptions can only apply when a company has sold or transferred "'all of its assets to another corporation.'" 209 Kan. at 310. In other words, NCR asserts that the sale or transfer of a *division* of a company—like the transfer of the Standard Precision Division and its assets

18

to NCR—is not subject to this same equitable analysis as a complete merger of a corporation.

But this argument reads too much into the "all of its assets" language. Indeed, *Comstock* itself involved the sale of some but not all of Vulcan's assets to Great Lakes. If the bright line that NCR seeks to draw existed, there would have been no need for the Kansas Supreme Court to consider whether that sale demonstrated a de facto merger with Vulcan or mere continuation of Vulcan's business. Instead, the court would have merely noted that a sale of less than all of a company's assets cannot transfer liability. Yet the *Comstock* court engaged in a lengthy analysis of whether the transfer of equipment to Great Lakes and the company's subsequent actions resulted in successor liability.

Nor do we find the absence of Kansas cases finding liability for the transfer of a division conclusive on this point. As previous decisions have observed, our caselaw includes relatively few published cases that analyze the question of successor liability. See *Wells Fargo Vendor Financial Services v. Nationwide Learning*, 56 Kan. App. 2d 259, 265, 429 P.3d 221 (2018). And *Comstock* recognized that previous Kansas cases had found "situations where liability may be imposed upon a transferee corporation by reason of absorption, consolidation, transfer of assets without consideration, or contractual agreement." *Comstock*, 209 Kan. at 313.

*Comstock* discussed another decision—*Crozier v. Shoe Co.*, 103 Kan. 565, 175 P. 376 (1918)—that we find instructive. *Crozier* was a garnishment action to collect funds that were held by a Kansas business but belonged to Menzies Shoe Company, a Michigan company. During the garnishment, it came to light that the funds were actually owned by a Wisconsin company (also called Menzies) that had previously acquired some—but not all—of the Michigan Menzies' assets. The Kansas Supreme Court recognized the funds could only be garnished if the Wisconsin company had assumed liability for the

19

Michigan company's debts. 103 Kan. at 566. And that "depend[ed] upon the relationship of the two corporations." 103 Kan. at 566.

The *Crozier* court ultimately found liability even though a third company had been involved in the transaction and had purchased some of the Michigan Menzies' assets. 103 Kan. at 566-67. In doing so, the court found that the assets of the Michigan company were essentially held in an implied trust to prevent a corporate transfer from masking liability. But the court's reasoning was rooted in the same equitable principles that guide modern discussions of successor liability—at the time of the court's decision the Wisconsin company held "all, or nearly all, the assets of the old company," and "it did not procure them as a wholly independent purchaser at a fair sale, nor otherwise freed of the pertinent liabilities attaching thereto." 103 Kan. at 567.

This approach is consistent with Kansas courts' flexible view of corporate liability—a view rooted in equity rather than legal formalism. See *Wells Fargo*, 56 Kan. App. 2d at 266-67. As the Kansas Supreme Court observed in 1915, there has long been a "tendency" in our state "to disregard the theory of a corporation as an entity separate from its corporators where justice between the real parties to the transaction requires it." *Spadra-Clarksville Coal*, 93 Kan. at 653. This is because the "application of the equitable doctrine of successor liability is fact-specific"; our goal is to assess "whether justice between the real parties to the transaction requires imposition of successor liability." *Wells Fargo*, 56 Kan. App. 2d at 266-67.

    1.2.    *Other courts have recognized the need for a flexible analysis as corporations have diversified.*

This flexible analysis of corporate structure is not unique to Kansas. Instead, a growing number of courts across the country have chosen to apply the exceptions to the general rule of nonliability for assets transfers in cases where only the assets of a *division*

of a corporation—but not the entire corporation—have transferred to another. See, e.g., *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 337 (D.N.J. 2002); *Syenergy Methods, Inc. v. Kelly Energy Systems*, 695 F. Supp. 1362, 1365 (D.R.I. 1988); *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1328, 147 Cal. Rptr. 3d 772 (2012), *rev. denied* January 23, 2013. These courts, like their Kansas counterparts, recognize the practical need for a flexible, equitable analysis as corporate structures become increasingly diversified and complex.

As a federal court in Rhode Island observed in *Syenergy Methods*, courts can "[n]o longer . . . assume that a single corporation engages in a single enterprise." 695 F. Supp. at 1365. Instead, modern corporations "may have many different divisions, each one participating in a wholly separate and distinct market or industry from all of the others." Given this reality, the court found that "the policies and purposes" of the de-facto-merger exception to nonliability demonstrate that it applies "not only to the sale of assets constituting an entire corporation with its subsequent dissolution, but to the sale of assets constituting a corporate division as well." 695 F. Supp. at 1365.

The New Jersey federal court in *Koch Materials* reached a similar conclusion when analyzing the mere-continuation exception to nonliability. There, the question of successor liability arose under a requirements contract when the division that was bound by the contract was sold to another company. The company that bought the division argued that its business could not be a mere continuation of the division because the original company still existed. But the federal court rejected this argument, reasoning that it "ma[de] little sense in the context of modern business, where a corporation might easily sell an entire division and carry on dutifully in another area." 205 F. Supp. 2d at 337. The court noted that the "reasonable business expectations of those who relied upon the spun-off division are no less worthy of continued protection, nor is the risk of intentional evasion of pre-existing contractual and tort obligations lower, simply because the original stockholders were wise enough to have diverse interests." 205 F. Supp. 2d at 337.

More recently, the California Court of Appeals was also faced with the question of whether there can be successor liability "when a corporation takes over a specific line of business that was operated separately by another corporation." *Cleveland*, 209 Cal. App. 4th at 1326. In doing so, the court considered whether liability could follow when "the assets of a separately maintained business or division . . . of a company . . . are transferred to a new company." 209 Cal. App. 4th at 1326. The court found that "the principles underlying the 'mere continuation' theory of successor liability are not confined to corporations." 209 Cal. App. 4th at 1329. Rather, "the factual and equitable nature of the successor liability doctrine" underscore that, in most cases, "no single factual element, standing alone, would establish or negate successor liability." 209 Cal. App. 4th at 1334.

     1.3.    *The* Comstock *exceptions can apply to the transfer of a corporation division.*

The reasoning of these decisions is persuasive and consistent with Kansas courts' practical approach to analyzing questions of successor liability. Our courts have long observed that the "naked allegation of sale and purchase" of corporate assets in an arm's length transaction, without more, does not transfer liability. *Mank v. Southern Kansas Stage Lines Co.*, 143 Kan. 642, 646, 56 P.2d 71 (1936). But Kansas decisions are loath to draw unnecessary distinctions that would allow "'unscrupulous businesspersons . . . to avoid successor liability and cheat creditors merely by changing the form of the transfer.'" *Wells Fargo*, 56 Kan. App. 2d at 269.

We conclude based on our review of Kansas caselaw, principles of equity, and the persuasive reasoning of these other courts' analyses that the *Comstock* exceptions may also apply to determine liability when only a division of a corporation rather than the whole corporation is transferred. To hold otherwise would be to ignore the ingenuity of companies in a corporate world that has become increasingly complex.

But we provide a note of caution. The fact that Kansas courts have been less rigid in our analysis of corporate structures in questions of successor liability does not mean that those structures are meaningless, or that there are not important and cognizable distinctions between a corporation and its divisions, or between a parent company and its subsidiary. Our decision here merely recognizes—as Kansas courts have for a century—that successor liability is an equitable doctrine that allows courts flexibility to "deal with the realities of the situation," whatever that situation may be. *Cities Service Co. v. Koeneke*, 137 Kan. 7, 29, 20 P.2d 460 (1933).

1.4.    *Factual questions remain that preclude summary judgment on the issue of successor liability.*

As we have noted, the ALJ determined that the *Comstock* exceptions to nonliability did not apply to the sale of a corporate division or its assets and thus did not analyze those exceptions in its decision. This decision—and the later decisions of the Secretary and district court affirming the ALJ's order—was thus based on an erroneous interpretation of the law and must be reversed. See K.S.A. 77-621(c)(4).

The parties urge us to take up that mantle for the first time on appeal and analyze the question of successor liability here based on the evidence that was submitted in the administrative proceedings. We decline that invitation.

Successor liability is an equitable principle that involves the weighing of many factors. See *Wells Fargo*, 56 Kan. App. 2d at 264. Each of the exceptions discussed in *Comstock* involves the weighing of factual and equitable considerations—a weighing appellate courts look to factfinders to conduct in the first instance. The absence of any analysis of these questions by the administrative decision-makers in this case precludes our court from conducting a meaningful analysis of those factors on appeal.

23

We reverse the earlier decisions in this case granting summary judgment against Raytheon and remand the case to the ALJ to analyze which party is liable for Standard Precision's previous contamination, based on the equitable principles discussed in *Comstock* and in this opinion.

2.     *The agency erred in granting summary judgment in favor of NCR in light of a genuine dispute as to a material fact.*

Raytheon's appeal also challenges a second aspect of the ALJ's decision, asserting a genuine dispute as to the material fact of whether NCR was independently responsible for the VOCs in the groundwater at the Site. We agree with Raytheon that summary judgment was granted in error.

Kansas courts have routinely held that summary judgment is inappropriate when "reasonable minds could disagree about the conclusions to be drawn from the evidence." *H.B. v. M.J.*, 315 Kan. 310, 313, 508 P.3d 368 (2022). Even if a tribunal may believe that the evidence weighs heavily in favor of one litigant over another, "[s]ummary judgment should never be granted merely because the court believes the movant would prevail at a trial on the merits." *Pipe v. Hamilton*, 274 Kan. 905, 907, 56 P.3d 823 (2002).

As an initial matter, KDHE argues that only NCR (and not Raytheon) was entitled to have factual disputes resolved in its favor, as the ALJ granted NCR's request for judgment but denied the request of Raytheon. NCR does not argue this point on its own behalf. But KDHE's argument is misplaced, because both KDHE and NCR moved for summary judgment on the question of whether NCR was directly liable for contamination at the Site. Thus, NCR was the nonmoving party for KDHE's motion, and KDHE was the nonmoving party for NCR's motion. Regardless, summary judgment is inappropriate when a genuine issue of material fact remains unresolved. *H.B.*, 315 Kan. at 313.

But KHDE's argument also highlights a confounding theme in this case—KDHE has shifted from the position articulated in its 2017 order. It now appears to view its role in this case not as a neutral enforcer of environmental regulations, but rather as an advocate with its thumb on the scale, seeking to enforce the law against Raytheon but absolve NCR from liability. The role of a state agency is to "administer, enforce, or interpret particular laws of the state, as authorized by the legislature." *Little v. State*, 34 Kan. App. 2d 557, Syl. ¶ 4, 121 P.3d 990 (2005). When the question on appeal is not whether KDHE had the *authority* to enforce environmental regulations by ordering remediation but rather *who* should be held liable for such remediation, it makes little sense why KDHE has spent so much time and energy trying to convince this court that the decisions rendered by the ALJ and district court were correct. This is especially true when KDHE itself offered an alternative theory on NCR's liability.

Indeed, as KDHE pointed out in the administrative order that gave rise to this action, there is a genuine dispute as to NCR's possible contribution of VOCs at the Site. Most notably:

- While NCR had exclusive control over the Site, it left discarded, empty drums around the property, which is evidence that NCR utilized drummed chemicals and had "poor waste management practices."

- The affidavit completed by NCR's paralegal included an acknowledgement that NCR used Chloroethene Nu (a solvent containing TCA—one of the VOCs found in the groundwater at the Site) in its own operations at the Site.

- The report submitted by John Connor, an environmental engineer who Raytheon retained as an expert in this action, concluded that TCA was a predominantly used chlorinated solvent during the period in which NCR took over production at the

25

Site, and that the drainage system at the Site was also connected to the underground sump.

The ALJ's summary-judgment ruling found that the affidavit stating Chloroethene Nu was used at the Site unpersuasive because it did not state the "exact details of when hazardous chemicals were used at the site." The ruling observed that the same affidavit indicated it "was difficult to make distinction between the operations of Standard Precision [Division] and [NCR] because the majority of the interviewees worked for both entities." In this way, the ALJ granted summary judgment on a factual dispute that reasonable minds could disagree about—who used Chloroethene Nu at the Site.

Raytheon argues that the agency deviated from the summary judgment standard by unilaterally determining that "'additional discovery would not reveal any additional findings'" concerning the matter. It asserts that, regardless of whether additional discovery would aid in clarifying who used Chloroethene Nu at the Site, the question is a factual dispute to be resolved by a finder of fact, not via summary judgment.

NCR and KDHE essentially argue that the ALJ's decision to grant summary judgment in favor of NCR should be upheld because the fact that the floor drain was cemented over weighs heavily in their favor. But summary judgment should never be granted merely because the court believes the movant would prevail at a trial on the merits. *Pipe*, 274 Kan. at 907. And Raytheon does not base its argument on pure speculation—it points to a genuine dispute related to the affidavit describing use of Chloroethene Nu at the Site. Given this genuine dispute as to a material fact, the agency should have proceeded to a hearing on this issue, where it could then properly act as a factfinder and resolve the dispute on the merits.

Because we reverse the ALJ's ruling on summary judgment, we need not reach Raytheon's challenges to KDHE's previous settlement with CECO and the effect that

settlement may have on Raytheon's ability to seek contribution from other entities responsible for the contamination. Any discussion of that issue would be premature in light of the remaining issues to be resolved on remand.

We reverse the ALJ's summary-judgment order—as well as the Secretary's and district court's decisions affirming that order—and remand the administrative action to the ALJ for further proceedings consistent with this decision.

Reversed and remanded with directions.